IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SLACKPASS, INC. d/b/a LAUNCHPASS, ) | **JURY DEMAND** |
| ) | |
| Plaintiff, ) | Case No. 1:23-cv-6393 |
| ) | |
| v. ) | |
| ) | |
| FROSTED, INC. d/b/a WHOP, CAMERON ) | |
| ZOUB, and STEVEN SCHWARTZ, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## VERIFIED COMPLAINT

Plaintiff SlackPass, Inc. d/b/a LaunchPass ("LaunchPass" or "Company"), by and

through its attorneys, Dentons, Cohen & Grigsby P.C., files this complaint against Frosted, Inc.

d/b/a Whop ("Whop"), Cameron Zoub ("Zoub") and Steven Schwartz ("Schwartz")

(collectively, "Defendants"), alleging as follows:

## I.     INTRODUCTION

1.      This case concerns LaunchPass, a company that is fighting for its survival in the

face of a competitor's outrageous, unlawful and relentless campaign to destroy its business.

2.      Founded in 2016, LaunchPass has transformed the market by being the first to

offer a product that enables entrepreneurs seamlessly to generate income from privately run

online chat communities on two popular social messaging platforms (i.e., Slack and Discord).

The Company's product handles community invites, manages permissions and processes

membership payments, thereby enabling entrepreneurs to monetize their content and popularity

online.  Through its innovation and hard work, LaunchPass has cultivated a significant and loyal

customer base and has become a leader in the market.

3.      The Defendants want to steal LaunchPass's business.  They have launched an all-out assault on the Company by infiltrating its business and damaging its computer systems, disrupting the Company's services, accessing valuable, proprietary information and targeting the Company's customers *en masse* with false statements about LaunchPass and predatory pricing offers intended to induce customers to stop doing business with the Company.  Indeed, the Defendants appear to have used many of the same techniques recently to eliminate another competitor.

4.      Apparently emboldened by their perceived impunity, the Defendants have *expressly admitted* to LaunchPass that the purpose and intent of their campaign is to eliminate LaunchPass as a competitor.  Defendant Cameron Zoub (one of Whop's three founders) recently presented LaunchPass with three ominous options:  First, LaunchPass could shut down its operations and transfer all of its customers to Whop in exchange for 40% of revenues for the next several years.  Second, LaunchPass could sell its business to Whop.  Third, if LaunchPass is not willing to accept either of those alternatives, Whop will simply drive LaunchPass out of business by continuing to target LaunchPass's customers and offering them Whop's services *for free*.[1]  Zoub's statements lay bare the Defendants' unlawful motivations and some of their bare-knuckles tactics.

5.      To be sure, the Defendants' scheme goes far beyond illegal, predatory pricing.  LaunchPass's investigation remains in its early stages, and many details of the Defendants' improper scheme remain solely in Defendants' possession.  Even at this juncture, however, LaunchPass has uncovered the following misconduct by the Defendants:

---

[1]      In fact, LaunchPass has learned that Whop is offering to *pay* LaunchPass's customers up to $10,000 to switch, if necessary, to steal them from LaunchPass.

(1)    Defendants have infiltrated LaunchPass's computer systems under false pretenses and are bombarding the Company's customers with direct, unsolicited messages, urging them to leave LaunchPass, in direct violation of LaunchPass's Terms of Use;

(2)    Defendants have accessed LaunchPass's customers' databases and deployed code to "scrape" confidential and proprietary information concerning the Company's customers and their community members for the purpose of targeting LaunchPass's customers with improper offers to leave LaunchPass and migrating those customers' users from LaunchPass to Whop without their knowledge or consent;

(3)    Defendants appear to have scraped LaunchPass's entire website in order to catalog all of LaunchPass's customers and aggressively target them;

(4)    Plaintiff has been pummeled with malicious code that bombards the Company's customers' accounts with information that has disrupted LaunchPass's services, overwhelmed LaunchPass's customer support resources and caused customers to believe that LaunchPass's services are not functioning properly;

(5)    The Defendants have lured away LaunchPass's top customer support representative for the purpose of obtaining and exploiting proprietary information concerning LaunchPass's business plans and customers; and

(6)    The Defendants have published and disseminated false and misleading statements regarding LaunchPass's pricing, quality and customer support.

6.    The Defendants' scheme is working exactly as intended.  Dozens of LaunchPass's most valuable customers have recently ceased doing business with the Company and have begun doing business with Whop instead.  Those customer losses account for *more than $100,000 in lost revenue each month*, and those losses are continuing to increase.  And that is exactly what the Defendants are trying to accomplish – i.e., Zoub explicitly acknowledged that Defendants intend to drive LaunchPass out of business by causing the Company's customers to "churn."

7.    LaunchPass also has been forced to devote extensive resources, time and money to respond to the Defendants' improper access to and damage of the Company's computer

systems, to correct the Defendants' falsehoods concerning LaunchPass and to salvage at least some of its relationships with customers.

8.      As set forth more fully below, Defendants' predatory pricing tactics constitute a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 *et seq.*; Defendants' false and misleading advertising violates the Lanham Act, 15 U.S.C. § 1125(a) *et seq.*, and constitutes disparagement and defamation; and Defendants' unauthorized access into and damage of LaunchPass's computer systems violates the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Through their actions, Defendants have also tortiously interfered with LaunchPass's current and prospective business relationships with its clients and engaged in unfair competition.

9.      In this action, LaunchPass seeks the following relief (among others): (1) an order enjoining Defendants' improper and unlawful conduct, (2) an order requiring Defendants to account for and return all information and other property taken by them from LaunchPass, (3) an order imposing a constructive trust over all aspects of Defendants' profits, gains and other benefits obtained through their improper conduct; and (4) an award of monetary damages, including the disgorgement of all revenues and gains obtained by Defendants, future lost profits attributable to Defendants' misconduct, treble and punitive damages and costs of suit.

## II.      PARTIES

10.      LaunchPass is a Delaware corporation with its principal place of business located at 11725 North 120th Street, Scottsdale, Arizona  85259.

11.      Upon information and belief, Whop is a Delaware corporation with its principal place of business located at 1460 Broadway, Apt. 2, New York, New York  10036.  Whop does business throughout the United States, including in this District.

12.      Zoub is an individual who, upon information and belief, resides in New York, New York.

4

13.     Schwartz is an individual who, upon information and belief, resides in New York, New York.

### III.     JURISDICTION AND VENUE

14.     This Court has original subject-matter jurisdiction over LaunchPass's Sherman Act, Lanham Act and Computer Fraud and Abuse Act ("CFAA") claims pursuant to 28 U.S.C. §§ 1331 and 1337.  This Court has supplemental subject-matter jurisdiction over LaunchPass's state-law claims pursuant to 28 U.S.C. § 1367 because they are so related to LaunchPass's federal claims that they form part of the same case or controversy.

15.     This Court has personal jurisdiction over the Defendants because they have conducted activities in, maintained sufficient contacts with, directed false, misleading and deceptive statements towards, have expressly aimed their misconduct towards and have otherwise caused harm in, this District in a manner sufficient to place them within the personal jurisdiction of this Court, as set forth more fully herein.  The Defendants' activities have had a substantial, direct and reasonably foreseeable effect on business and commerce in this District and on interstate commerce.

16.     Venue is proper in this Court under 15 U.S.C. § 22 because a substantial part of the events giving rise to the claims occurred in this District and because Defendants are subject to personal jurisdiction in this District.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District.

# IV.     FACTUAL BACKGROUND

## A.     LaunchPass and Its Business

17.     Founded in 2016 by Seth Lesky (a software engineer and Computer Science honors graduate from the University of Arizona), LaunchPass transformed the competitive landscape for entrepreneurs seeking to manage their own paid, private chat communities online.

18.     By way of brief background, Slack and Discord are two popular online chat community platforms whose users can exchange media and communicate with each other using voice and video calls, messages and private "chats" or "communities."  These platforms are immensely popular; based on publicly available information, Slack counts approximately 18 million members, and Discord has nearly 200 million.

19.     Both Slack and Discord offer users free membership and access to their communities.  Both platforms also allow users to create private, invitation-only communities.

20.     Certain Slack and Discord users charge fees for other users to join their communities and access additional content.  Doing so creates a number of practical and logistical challenges for the organizer, however, including the need to authorize and restrict access, manage and track memberships, process payments and track metrics.

21.     LaunchPass changed all that.  The Company created a program that allows users easily and seamlessly to manage all aspects of their paid communities.  In so doing, LaunchPass created a unique value proposition – i.e., an easy and flexible means for anyone to monetize their influence and content online through the use of paid chat communities (the "Online Chat Community Monetization Market").

22.     The Company charges its users a 3.5% fee on each subscription-fee transaction processed by the user, along with a flat $29 monthly fee for each community.  That same pricing

structure applies uniformly across the board, regardless of whether a user's community has 20 members or 20,000.  The subscription fees charged by the Company's customers vary widely, from a few dollars a month to several hundred.

23.     LaunchPass has devoted significant time, effort and resources to develop, implement and commercialize its service.  The Company then spent years refining and improving its product, identifying and marketing its services to prospective users, building brand loyalty, fostering relationships with its clients and maintaining customers through 24/7 customer service and competitive pricing.  As a result of those efforts, the Company has become a market leader with a large and loyal customer base.

24.     As of the end of 2022, LaunchPass had thousands of customers who varied broadly in size and type.  They ranged from part-time language tutors, to Instagram influencers, to professional YouTube content creators, to purveyors of financial market advice – and everyone in-between.  LaunchPass made it simple and easy for anyone – for everyone – to monetize their creative efforts.

25.     LaunchPass offers its services throughout the United States and globally, and is limited only by the locations in which its payment processing servicer, Stripe, operates.[2]

26.     After LaunchPass was founded, a handful of competitors have entered the Online Chat Community Monetization Market with integrated solutions competitive with LaunchPass's. Hyper entered the market in 2020 with significant funding and attracted a sizeable user base with its product.  By 2022, Hyper accounted for an estimated fifteen percent of accounts in the Online Chat Community Monetization Market, particularly through attracting emerging users.  At that

---

[2]     LaunchPass uses Stripe to process membership fees.  Stripe charges a separate processing fee of 2.9% + 30 cents per transaction.

time, Whop accounted for approximately twenty percent of accounts, with LaunchPass accounting for roughly sixty percent of the market.  Other competitors were unable to amass a significant volume of users.#

27.     There are significant barriers to entry into the Online Chat Community Monetization Market.  For example (and without limitation), consumers value and rely upon brand awareness, reputation and reviews from other users.  Further, customers are unlikely to switch providers absent significant incentives given the difficulties associated with migrating all of the subscribers from one service provider to another, particularly given LaunchPass's comparatively low fees.  Economies of scale are equally important – i.e., a service provider needs to amass a significant number of customers to offset the costs of its software development, network maintenance and customer service.

28.     A competitor seeking to enter into the Online Chat Community Monetization Market would need to obtain significant financial capital and devote several years to develop, commercialize, achieve adoption of and scale up a service that would compete effectively with LaunchPass.

**B.      Defendants**

29.     Founded in 2021, Whop bills itself as "a marketplace where consumers can browse, discover and buy digital goods and services."  The company was founded by Zoub, Schwartz and Jack Sharkey.  At its inception, the company had nothing to do with the Online Chat Community Monetization Market.

30.     Zoub and Schwartz got their inauspicious start in the digital "marketplace" approximately ten years ago by renting out and re-selling automated "bots"– i.e., programs that customers could use to find and obtain hard-to-find retail products online, such as sneakers.

31.     Since then, Zoub and Schwartz (and, more recently, Sharkey) have darted from one "next big idea" to the next, starting and abandoning several online ventures in the process.

32.     After apparently seeing LaunchPass's success, Zoub and Schwartz set their sights on the Online Chat Community Monetization Market.  But they did not want to devote the money, time and effort to build a quality product and build a reputation with their customers. Instead, they chose to lie, cheat and steal their way in.

33.     Indeed, Whop's entry into the Online Chat Community Monetization Market was punctuated by a lawsuit filed in early 2022 by LaunchPass's competitor – Hyper.

34.     As Hyper alleged in a complaint filed in the U.S. District Court for the Southern District of New York (the "Hyper Suit"), Whop had utilized a series of improper, deceitful, unethical and unlawful tactics to build a copycat product and to steal Hyper's customers.  *See* Complaint, *Frenzy Technologies, Inc. d/b/a Hyper.co v. Frosted, Inc. d/b/a Whop.com*, No. 1:22-cv-01223-MKV (S.D.N.Y. Feb. 14, 2022).

35.     Hyper and Whop ultimately mediated the Hyper Suit and advised the Court in February, 2023, that they had reached a settlement agreement, the terms of which were not disclosed on the court's docket.

36.     Not long after the settlement had been reached, Hyper announced to all of its customers that, effective June 1, 2023, Hyper would be shutting down its operations and transferring its remaining customers to Whop.

37.     And while Hyper was transferring Hyper's customers to Whop, Whop was in the process of securing significant seed capital to expand its operations.

38.     Zoub admitted to Lesky that Whop had recently purchased a competitor for a severely depressed price because the Defendants had been successful in forcing most of that

competitor's customers to "churn" (i.e., to leave that company or force it to offer its services for free).

39.     In other words, Whop appears to have accomplished exactly what it wanted through its improper and illegal tactics – i.e., the Defendants gained a foothold in the Online Chat Community Monetization Market by improperly forcing a competitor to the brink of collapse and then purchasing its business at a severe discount.

40.     Although the Hyper Suit was recently settled, Hyper's complaint is highly revealing because it describes much (although not all) of the misconduct that Whop is directing toward LaunchPass.

**C.     Defendants' Misconduct Targeting LaunchPass**

41.     After Whop successfully eliminated Hyper from the market, the Defendants set their sights squarely on LaunchPass.  With Hyper out of the picture, LaunchPass is the largest remaining competitor in the Online Chat Community Monetization Market.

42.     More specifically, the Defendants have unleashed a multi-prong campaign for the stated purpose of driving LaunchPass out of business.  Although LaunchPass does not yet know the full extent and scope of the Defendants' misconduct – and all of the individuals involved – this Complaint sets forth a non-exhaustive series of examples that have been uncovered to date.

43.     Defendants' conduct harms competition by not only eliminating any material competitors in the Online Chat Community Monetization Market today, but it also chills any incentive for others to enter the market.  Access to capital is a significant barrier to entry and investors will be unwilling to invest capital if Whop can continue its predatory practices with impunity, decimating any competitive threat at its incipiency.  And, Whop just announced on July 20, 2023, that it had secured another $17 million in capital.

***i.***      ***Defendants Infiltrate LaunchPass's Computers to Steal Customers and Sabotage the Company's Services.***

44.      LaunchPass has recently discovered that, beginning in late 2022, Zoub, Schwartz and numerous other employees or agents of Whop began intentionally accessing LaunchPass's computers and computer systems without authorization and in excess of any authorization they arguably could have had.

45.      More specifically, Zoub, Schwartz and numerous other employees or agents of Whop signed up for various private chat communities maintained by LaunchPass's customers under false pretenses (and often, although not always, using email accounts designed to hide their identity or affiliation with Whop).

46.      Once they obtained access, Defendants employed various tactics to divert LaunchPass's customers, steal LaunchPass's information and disrupt LaunchPass's services.

47.      For instance, Defendants began bombarding LaunchPass customers and their community members with unsolicited messages intended to induce those users to leave LaunchPass and to begin doing business with Whop through the use of predatory pricing offers (discussed more fully below).

48.      Upon information and belief, Defendants offered some LaunchPass customers to switch to Whop for free (and, occasionally, in return for *payment by Whop*) in exchange for access to those users' administrator privileges in order to gain access to detailed information concerning those users' community members and to run automated commands. (Whop's publicly available migration instructions likewise instruct customers to grant Whop heightened permissions, including administrative access to their accounts.[3])

---

[3] *See* https://docs.whop.com/launchpass?ref=whop.com.

49.     Upon information and belief, Defendants deployed "scraping" code to comb through, harvest and collect information concerning LaunchPass's customers and their community members for the purpose of targeting those users to leave LaunchPass and to migrate those community members *en masse* to Whop.

50.     Defendants improperly accessed modules available only to LaunchPass customers (i.e., community hosts) and deployed malicious code to execute thousands of commands intended both to access customers' subscription information and to disrupt and overload the Company's servers.  Those attacks created the false impression for LaunchPass's customers that the Company's services do not function properly.

51.     At the same time, LaunchPass has also been bombarded with code that flooded LaunchPass's customers' accounts with data, thereby preventing and hindering customers' ability to use LaunchPass's services.

52.     Defendants employed deceptive tactics to try to obtain LaunchPass's future business plans.  Specifically, Whop's head of "Growth," Ethan Rotstein, signed up for LaunchPass's services – going so far as to publish his own fabricated group using LaunchPass – pretending to be an actual customer "looking to set up my new discord cook group."  Rotstein then submitted inquiries to LaunchPass's Customer Success Specialists, intended to discover LaunchPass's upcoming technological plans and capabilities.

53.     The Defendants' aforementioned conduct violates LaunchPass's Terms of Use, which provide, in relevant part, as follows:

> **Access to the Site**
>
> **License.** Subject to these Terms, Company grants you a non-transferable, non-exclusive, revocable, limited license to use and access the Site.
>
> **Certain Restrictions.** The rights granted to you in these Terms are subject to the following restrictions: (a) you may access and use the Site only for lawful,

authorized purposes and you shall not misuse the Site in any manner; (b) you shall not modify, make derivative works of, disassemble, reverse compile or reverse engineer any part of the Site; (c) you shall not access the Site in order to build a similar or competitive website, product, or service; and (d) except as expressly stated herein, no part of the Site may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means.  Unless otherwise indicated, any future release, update, or other addition to functionality of the Site shall be subject to these Terms.  All copyright and other proprietary notices on the Site (or on any content displayed on the Site) must be retained on all copies thereof. . . .

**Acceptable Use Policy.**

. . . .  In addition, you agree not to: … (ii) send through the Site unsolicited or unauthorized advertising, promotional materials, junk mail, spam, chain letters, pyramid schemes, or any other form of duplicative or unsolicited messages, whether commercial or otherwise; (iii) use the Site to harvest, collect, gather or assemble information or data regarding other users, including e-mail addresses, without their consent; (iv) interfere with, disrupt, or create an undue burden on servers or networks connected to the Site, or violate the regulations, policies or procedures of such networks; (v) attempt to gain unauthorized access to the Site (or to other computer systems or networks connected to or used together with the Site), whether through password mining or any other means; (vi) harass or interfere with any other user's use and enjoyment of the Site; or (vi) use software or automated agents or scripts to produce multiple accounts on the Site, or to generate automated searches, requests, or queries to (or to strip, scrape, or mine data from) the Site (provided, however, that we conditionally grant to the operators of public search engines revocable permission to use spiders to copy materials from the Site for the sole purpose of and solely to the extent necessary for creating publicly available searchable indices of the materials, but not caches or archives of such materials, subject to the parameters set forth in our robots.txt file).

54.     Through their aforementioned misconduct, Defendants obtained valuable confidential and otherwise proprietary information belonging to LaunchPass and its customers.

55.     Defendants undertook the aforementioned actions knowingly and with the intent to defraud LaunchPass.

56.     Through their aforementioned conduct, Defendants knowingly caused the transmission of programs, codes and commands to damage to LaunchPass's computers and computer systems.

57.     As a result of Defendants' aforementioned misconduct, LaunchPass has incurred tens of thousands of dollars in damages, including the costs to detect and respond to the Defendants' attacks and improper access, hundreds of hours to assess the resulting damage and disruption to the Company's services and to debug and restore its systems.  Further, LaunchPass has suffered significant damages (among others) in the form of revenues lost because of Defendants' disruption and interruption of the Company's services.

### ii.     _Defendants Spread Falsehoods About LaunchPass and Its Services._

58.     Defendants have begun spreading lies about LaunchPass's pricing and services to induce the Company's customers to switch to Whop and to harm LaunchPass's business.  For example, Whop's website contains a marketing page intended to convince consumers to switch from LaunchPass's services to Whop's.  On that page, Whop falsely states that LaunchPass is "charging ~2%+ more than Whop on each transaction."[4]

59.     That representation is false.  LaunchPass's fee is 3.5% per transaction, along with a flat fee of $29 per month per community.  (The $29 fee is effectively a _de minimis_ fee for larger communities, and LaunchPass provides accommodations for smaller communities where the $29 fee presents a hardship.)

60.     According to its website, Whop charges different fees depending on whether Whop acts as the "Merchant of Record" or whether the client uses Stripe for its payments.  When Whop is the Merchant of Record ("MoR"), Whop charges a fee of 4.5% + 40 cents.  For clients using Stripe, Whop charges 3%.

---

[4]     https://docs.whop.com/launchpass (last visited July 24, 2023).

61.     In other words, the difference in the transactional fees between LaunchPass and Whop is .5% *at most*, and Whop is 1% *more* expensive than LaunchPass where Whop acts as the MoR.

62.     In addition, Whop has begun to spread rumors to targeted LaunchPass customers that LaunchPass is now providing its services to all of its customers free of charge.  That statement is also false, and it has led to a sudden and substantial surge in demand from LaunchPass customers seeking 0% fees.

63.     Further, Whop has published an advertisement on its "blog" entitled "The #1 LaunchPass Alternative for Discord Monetization & Management: Whop."[5]  That advertisement contains a number of false and misleading statements concerning LaunchPass and its business as well.  For example, the advertisement contains the following statements (among others):

> (1)  "Launchpass has a reputation for leaving creators out in the cold when they need the support most."
>
> (2)  "Launchpass fails to meet creator expectations in customer support. And they charge higher fees than many are willing to stomach."
>
> (3)  "The last thing you want is for a member to have an issue with billing and have your delicate ecosystem start to crumble. But unfortunately, this is an experience Launchpass creators are all too familiar with."

64.     Each of the aforementioned statements (among others) is false and misleading.

65.     Zoub, Schwartz and other Whop employees and representatives have repeated the aforementioned misrepresentations in dozens of direct written communications and telephone calls with LaunchPass's current and prospective customers as part of their improper campaign divert those customers to Whop.

---

[5]     https://whop.com/blog/launchpass-alternative (last visited July 24, 2023).

### iii.     *Defendants' Predatory Pricing Scheme*

66.     Contrary to Defendants' false advertising, the fact of the matter is that LaunchPass is a market leader with competitive prices, exceptional customer service and a loyal brand following.

67.     Indeed, Defendants apparently know these facts and concluded that their false advertising and illegal computer tactics are not sufficient to divert LaunchPass's customers to Whop.  As a result, the Defendants have resorted to predatory pricing – i.e., the same tactic that Whop used on Hyper according to Hyper's complaint.

68.     As discussed above, Defendants have employed a range of improper tactics to obtain a direct line of communication with LaunchPass's customers and prospective customers. Once they did, Defendants used improper tactics to induce LaunchPass's customers to cease (or not to commence) business relationships with LaunchPass and to become Whop's customers instead.

69.     More specifically, Defendants did not offer LaunchPass's customers the fees that Whop advertises on its website – i.e., 4.5% + 40 cents when Whop is Merchant of Record and 3% for clients using Stripe.  To the contrary, Defendants offered to provide Whop's services *for free* to existing LaunchPass customers for a period of one or two years.

70.     In numerous instances, Defendants coupled their "free services" proposal with offers of affirmative consideration (including trips and "signing bonuses" in the amount of up to $10,000) to existing LaunchPass customers in exchange for switching.

71.     The Defendants' intention is clear:  Defendants are forgoing *all revenue* (or virtually all revenue) and pricing Whop's products *below cost* in order to drive LaunchPass out

of business by diverting the Company's significant customers and gutting its revenues.  Whop charges its other, Non-LaunchPass customers its standard, listed rate of 3% or 4.5%.

72.     In response to these tactics, dozens of LaunchPass customers have ceased doing business with LaunchPass and became Whop's customers.  Whop publicly boasts about the customers it has diverted form LaunchPass on its Twitter feed, which now lists more than *one hundred* former LaunchPass customers as Whop's.

73.     As a result of the Defendants' tactics, LaunchPass has lost customers that had accounted for more than $100,000 in monthly revenue.

74.     Moreover, every lost LaunchPass customer equates, in reality, to the loss of many additional LaunchPass customers.  As Whop knows, each LaunchPass customer was and is a critical referral source for other customers.  Indeed, one of LaunchPass's primary generators of growth is a positive review, post or recommendation by a LaunchPass customer.  In that respect, LaunchPass suffers losses exponentially greater than each existing customer diverted by Whop, and Whop knows as much.

75.     The Defendants are actively pursuing these tactics with LaunchPass customers, and numerous LaunchPass customers are informing the Company on a daily basis that they are leaving LaunchPass because Whop's predatory pricing offer is too good to pass up.

76.     Even in the rare instances where Whop is unable to convince a LaunchPass customer to switch, the Defendants are aggressively encouraging those customers to demand free services from LaunchPass to stay with the Company, using Whop's offer as "leverage."  Here again, the Defendants' intentions are clear:  the Defendants are seeking to eliminate LaunchPass's revenues, and if they are unable to convert a LaunchPass customer to join Whop, they want to ensure that LaunchPass does not generate any revenues from that customer either.

77.     Due, at least in part, to Whop's recent infusion of significant additional seed capital, Defendants have ample capital to successfully implement their predatory pricing scheme.

78.     Now that Whop has eliminated Hyper as a competitor, LaunchPass is the largest remaining participant in the Online Chat Community Monetization Market.  The other remaining participants do not account for more than ten percent of the market.  The Defendants intend to incur short-term losses in order to divert all of LaunchPass's customers and eliminate LaunchPass's revenues, thereby forcing it to shut its operations.  Once Defendants have successfully driven LaunchPass out of business, it is evident that they plan on recouping those short-term losses as the largest remaining participant in the market.

### iv.     *Defendants Lure Away LaunchPass's Top Customer Service Representative to Obtain the Company's Proprietary Information.*

79.     In April, 2023, Defendants lured away LaunchPass's top customer service representative, Daniel Nguyen.  When LaunchPass made Nguyen a lucrative counteroffer, more than doubling his salary, Nguyen rejected it and said that Whop had promised to beat whatever offer LaunchPass would make to retain him.

80.     Significantly, in his exit interview, Nguyen told LaunchPass that he was being hired for a position as "Project Manager" – a role with which Nguyen had had no professional experience.  A review of Nguyen's current LinkedIn profile reveals that that statement was false. The truth is that Nguyen serves as an Account Manager for Whop and touts his ability to "foster" and "maintain" relationships with "top-tier clients" – i.e., the very same clients to which Nguyen was introduced during his tenure with LaunchPass.

81.     Upon information and belief, Defendants knew that Nguyen had developed strong relationships with LaunchPass's largest customers and had detailed knowledge concerning

LaunchPass's proprietary and confidential information concerning the Company's business strategy and largest customer identities, needs and preferences.

82.     Nguyen had extensive contact with LaunchPass's largest and most critical accounts on a daily basis.  After Nguyen's departure, Whop effectively diverted those same critical accounts in significant numbers and at a rapid pace.

83.     Upon information and belief, Defendants induced Nguyen to join Whop for the purpose of obtaining and exploiting the Company's aforementioned proprietary and confidential information.

84.     Upon information and belief, Defendants obtained the aforementioned proprietary and confidential information in structuring and executing their plan of attack against LaunchPass.

85.     In so doing, Defendants appear to have caused Nguyen to violate his contractual confidentiality obligations to the Company and have misappropriated LaunchPass's proprietary information.

86.     Upon information and belief, discovery in this case will reveal additional improper, unethical and unlawful tactics used by the Defendants to undermine LaunchPass's business, to damage its reputation and goodwill and to divert its customers.

     *v.*     ***Zoub Admits to Defendants' Scheme.***

87.     Against the backdrop of Defendants' unyielding assault against LaunchPass, Zoub reached out directly to Lesky several weeks ago with what was effectively an ultimatum.  During a call on June 3, 2023, Zoub declared to Lesky that LaunchPass had only one of three options: (i) transfer its customers to Whop in exchange for an ongoing "royalty fee" for several years;

(ii) sell its business to Whop; or (iii) face the prospect of imminent collapse as a result of Defendants' continued improper predatory pricing and "churning" campaign.

88.     On the heels of that call, Lesky emailed Zoub on June 4, 2023 seeking clarification on Zoub's "options."

89.     Zoub responded via email later that same day.  As to Option 1, Zoub proposed "something along the lines of a 60/40 (40% to you) split would probably work for us and for call it 3 years."  In other words, Zoub explicitly proposed that LaunchPass exit the market and allocate its customers to Whop, in violation of the antitrust law.

90.     As to Option 2, Zoub effectively warned Lesky that the longer LaunchPass resists, the lower the Defendants' purchase price would become – as was the case with Hyper.  As Zoub boasted: "[W]e just purchased another company in the space that had a lot of their users churning and joining Whop and they sold us their company at a 6-month multiple given how little were remaining, but I know you guys have quite a bit more customers than them so I imagine it would be more than that."

91.     As to Option 3, Zoub reiterated that the Defendants will "do whatever it takes to get as many businesses on Whop," noting that "options #1 and #2 would save both parties a lot of time and have all parties walk away happy."

92.     On June 14, 2023, LaunchPass's counsel sent Whop a letter demanding that Whop cease and desist its anticompetitive behavior, and requested that Whop provide assurances that Whop would cease such behavior by June 19, 2023.

93.     Whop did not respond to that correspondence.

94.     In fact, LaunchPass has discovered that Mr. Rotstein has and others have continued to improperly sign up for LaunchPass's platform in order to solicit LaunchPass customers to join Whop.

95.     As a result of Defendants' aforementioned ongoing misconduct, LaunchPass has suffered substantial damages and has suffered – and continues to suffer – monetary and irreparable harm, including the loss of customers, sales and business opportunities as well as harm to the Company's reputation and customer goodwill.

96.     Further, Defendants have made clear that they have no intention of stopping their misconduct.  Absent injunctive relief from the Court, LaunchPass faces the imminent risk of continued irreparable harm as a direct result of Defendants' misconduct.  Defendants are attempting to eliminate LaunchPass from the market, and absent relief from this Court, there is a substantial likelihood that Defendants will succeed in so doing.

97.     Defendants' misconduct is willful, malicious and outrageous.

## COUNT I
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**(Against All Defendants)**

98.     LaunchPass incorporates herein by reference the allegations contained in Paragraphs 1-97 as though set forth in their entirety.

99.     The products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

100.    Defendants have engaged in the anticompetitive and exclusionary conduct described herein in the form of predatory pricing.

101.    Defendants have priced Whop's product below its marginal and/or average variable cost, by offering its product to LaunchPass customers for 0% (or effectively 0%) in fees,

and, in some instances, by offering to pay LaunchPass's customers in trips or cash signing bonuses.

102.    Defendants have a dangerous probability of recouping their investment in below-cost pricing insofar as they can financially withstand short-term losses until Whop's largest and last meaningful competitor, LaunchPass, is forced out of the market.

103.    Further, Defendants have engaged in unfair tortious conduct towards LaunchPass, as discussed more fully in this Complaint, which likewise constitutes anticompetitive conduct in violation of Section 2 of the Sherman Act.

104.    Defendants are acting with the specific intent to monopolize and harm competition in the Online Chat Community Monetization Market.

105.    As a direct and proximate result of Defendants' violations of the antitrust laws, (1) consumers have been deprived of the full benefits of competition in the relevant market, (2) LaunchPass has been injured by ongoing and increasing revenue losses and loss to its reputation in an amount to be determined at trial, and (3) LaunchPass has suffered and is threatened with continued loss or damage to its business.

106.    LaunchPass's injuries cannot be fully compensated by the award of monetary damages alone.  LaunchPass has no adequate remedy at law, and Whop's aforementioned misconduct will continue unless enjoined.

### COUNT II
### Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)
### (Against All Defendants)

107.    LaunchPass incorporates herein by reference the allegations contained in Paragraphs 1-97 as though set forth in their entirety.

108.     The products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

109.     Defendants have engaged in the anticompetitive and exclusionary conduct described herein by attempting to induce LaunchPass to enter into an agreement to allocate the Online Chat Community Monetization Market with the intent to gain monopoly power in that market.

110.     Specifically, Defendants have proposed that LaunchPass cease competing with Whop by allowing Whop to acquire all of LaunchPass's customers in exchange for 40% of the revenues generated by LaunchPass's customers.  Defendants proposed that this market allocation agreement last for three years.

111.     In support of that proposal, Defendants asserted that this proposed market allocation would create stability for LaunchPass by allowing LaunchPass to "generate revenue for a long time."

112.     LaunchPass refused to engage in this anticompetitive conduct.

113.     However, had LaunchPass agreed to Defendants' proposed market allocation, Whop would have absorbed a significant competitor's customers, creating a dangerous probability of Whop's gaining monopoly power for online chat community monetization.

114.     Defendants have acted and are acting with the specific intent to monopolize and harm competition in the Online Chat Community Monetization Market.

115.     As a direct and proximate result of Defendants' violations of the antitrust laws as alleged herein, (1) consumers have been deprived of the full benefits of competition in the relevant market, (2) LaunchPass has been injured by ongoing and increasing revenue losses and

loss to its reputation in an amount to be determined at trial, and (3) LaunchPass has suffered and is threatened with continued loss or damage to its business.

116.     LaunchPass's injuries cannot be fully compensated by the award of monetary damages alone.  LaunchPass has no adequate remedy at law, and Defendants' aforementioned misconduct will continue unless enjoined.

**COUNT III**#
**Violation of the Arizona Uniform State Antitrust Act, A.R.S. § 44-1403**
**(Against All Defendants)**

117.     LaunchPass incorporates herein by reference the allegations contained in Paragraphs 1-97 as though set forth in their entirety.

118.     The products at issue in this case are sold in commerce in the state of Arizona, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, commerce in the state of Arizona.

119.     Defendants have engaged in the anticompetitive and exclusionary conduct described herein in the form of predatory pricing.

120.     Defendants have priced Whop's product below its marginal and/or average variable cost, by offering its product to LaunchPass customers for 0% (or effectively 0%) in fees, and, in some instances, by offering to pay LaunchPass's customers in trips or cash signing bonuses.

121.     Defendants have a dangerous probability of recouping their investment in below-cost pricing insofar as they can financially withstand short-term losses until Whop's largest and last meaningful competitor, LaunchPass, is forced out of the market.

122.     Further, Defendants have engaged in unfair tortious conduct towards LaunchPass, as discussed more fully in this Complaint, which likewise constitutes anticompetitive conduct in violation of the Arizona Uniform State Antitrust Act, A.R.S. § 44-1403.

123.     Defendants are acting with the specific intent to monopolize and harm competition in the Online Chat Community Monetization Market.

124.     As a direct and proximate result of Defendants' violations of the antitrust laws, (1) consumers have been deprived of the full benefits of competition in the relevant market, (2) LaunchPass has been injured by ongoing and increasing revenue losses and loss to its reputation in an amount to be determined at trial, and (3) LaunchPass has suffered and is threatened with continued loss or damage to its business.

125.     LaunchPass's injuries cannot be fully compensated by the award of monetary damages alone.  LaunchPass has no adequate remedy at law, and Defendants' aforementioned misconduct will continue unless enjoined.

**COUNT IV**
**Violation of the Arizona Uniform State Antitrust Act, A.R.S. § 44-1403**
**(Against All Defendants)**

126.     LaunchPass incorporates herein by reference the allegations contained in Paragraphs 1-97 as though set forth in their entirety.

127.     The products at issue in this case are sold in commerce in the state of Arizona, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, commerce in the state of Arizona.

128.     Defendants have engaged in the anticompetitive and exclusionary conduct described by attempting to induce LaunchPass to enter into an agreement to allocate the Online Chat Community Monetization Market with the intent to gain monopoly power in that market.

129.    Specifically, Defendants have proposed that LaunchPass cease competing with Whop by allowing Whop to acquire all of LaunchPass's customers in exchange for 40% of the revenues generated by LaunchPass's customers.  Defendants proposed that this market allocation agreement last for three years.

130.    In support of that proposal, Defendants asserted that this proposed market allocation would create stability for LaunchPass by allowing LaunchPass to "generate revenue for a long time."

131.    LaunchPass refused to engage in this anticompetitive conduct.

132.    However, had LaunchPass agreed to Defendants' proposed market allocation, Whop would have absorbed a significant competitor's customers, creating a dangerous probability of Whop gaining monopoly power for online chat community monetization.

133.    Defendants have acted and are acting with the specific intent to monopolize and harm competition in the Online Chat Community Monetization Market.

134.    As a direct and proximate result of Defendants' violations of the antitrust laws as alleged herein, (1) consumers have been deprived of the full benefits of competition in the relevant market, (2) LaunchPass has been injured by ongoing and increasing revenue losses and loss to its reputation in an amount to be determined at trial, and (3) LaunchPass has suffered and is threatened with continued loss or damage to its business.

135.    LaunchPass's injuries cannot be fully compensated by the award of monetary damages alone.  LaunchPass has no adequate remedy at law, and Defendants' aforementioned misconduct will continue unless enjoined.#

**COUNT V**
**Violation of Computer Fraud and Abuse Act (18 U.S.C. § 1030)**
**(Against All Defendants)**

136.     LaunchPass incorporates herein by reference the allegations contained in Paragraphs 1-97 as though set forth in their entirety.

137.     LaunchPass's computers are involved in interstate and foreign commerce and are protected under 18 U.S.C. § 1030(e)(2).

138.     Defendants knowingly, intentionally and repeatedly accessed LaunchPass's computers without authorization and in excess of authorization, including areas behind a login/password barrier.

139.     Defendants intended to defraud LaunchPass by knowingly obtaining and using valuable information stored on those computers to compete unfairly with LaunchPass.

140.     Defendants knowingly caused the transmission of a program, information, code or command, and as a result of such conduct, intentionally caused damage without authorization to LaunchPass's protected computers.

141.     As a result of Defendants' conduct, LaunchPass has suffered losses of more than $5,000 in the preceding one year period, including, without limitation, the cost of responding to Defendants' actions, conducting a damage assessment, restoring the data, program, system and/or information to its condition prior to the Defendants' conduct, as well as the revenues lost, costs incurred and consequential damages incurred because of interruption of service.

**COUNT VI**
**Violation of The Lanham Act (15 U.S.C. § 1125)**
**(Against All Defendants)**

142.     LaunchPass incorporates herein by reference the allegations contained in Paragraphs 1-97 as though set forth in their entirety.

143.    Both LaunchPass and Whop have customers throughout the United States and worldwide, and LaunchPass's and Whop's products are used in interstate commerce.

144.    Defendants have disseminated or permitted the dissemination of, and continue to disseminate or permit the dissemination of, false and misleading statements regarding the price and quality of LaunchPass's products and services through commercial advertising or promotion.

145.    Defendants' false and misleading statements have deceived and tended to deceive – and continue to deceive and to tend to deceive – a substantial portion of the intended audience, including LaunchPass's and Whop's customers and potential customers.

146.    Defendants' false and misleading statements are material and have influenced, and are likely to continue to influence, the purchasing decisions of potential customers in the Online Chat Community Monetization Market, including LaunchPass's and Whop's customers and potential customers.

147.    Defendants' false and misleading statements have caused, and will continue to cause, actual confusion among potential purchasers in the Online Chat Community Monetization Market, including, without limitation, LaunchPass's and Whop's customers and potential customers, regarding the price and quality of LaunchPass's products and services.

148.    Defendants made the false and misleading statements at issue knowing those statements to be false and misleading, and with the specific intent to harm LaunchPass by diverting sales and profits from LaunchPass to Whop.

149.    Defendants undertook the misconduct at issue in bad faith and without any justification.

150.    As a direct result of Defendants' false and misleading statements, LaunchPass has suffered damages.

151.    As a direct result of Defendants' false and misleading statements, LaunchPass has suffered, and continues to suffer, irreparable harm, including the loss of business opportunities, goodwill, reputation, profits and market share.

152.    Unless enjoined, Defendants' false and misleading statements will continue to cause irreparable harm to LaunchPass, for which there is no adequate remedy at law.

### COUNT VII
**Tortious Interference with Existing and Prospective Contractual Relationships**
**(Against All Defendants)**

153.    LaunchPass incorporates herein by reference the allegations contained in Paragraphs 1-97 as though set forth in their entirety.

154.    LaunchPass has ongoing contractual relationships with its customers and has a reasonable expectation that those relationships will continue.

155.    LaunchPass also has a reasonable expectation of entering into further valid business relationships with its current and prospective clients.

156.    At all relevant times, Defendants were and continue to be aware of LaunchPass's ongoing business and contractual relationships with its customers and business expectancies with prospective customers.

157.    Defendants have intentionally interfered, and are continuing to interfere, with LaunchPass's ongoing business and contractual relationships with its customers as well as its prospective business relationships.

158.    Defendants are using wrongful means to interfere with LaunchPass's ongoing business and contractual relationships with its customers and prospective customers by, among other things, improperly accessing LaunchPass's computer systems in violation of the Computer Fraud and Abuse Act to obtain the Company's valuable information and to disrupt its services,

engaging in predatory pricing in violation of the Sherman Act, making false and misleading statements, engaging in unfair competition and by otherwise violating LaunchPass's legal rights.

159.   Defendants' intentional interference has induced and/or caused the breach of LaunchPass's ongoing business and contractual relationships with its customers and prospective customers.

160.   Defendants' conduct is not privileged or justified, and it otherwise represents an abuse of any conditional privilege that might have otherwise applied.

161.   Defendants' conduct has damaged LaunchPass and has caused, and continues to cause, irreparable harm and injury to LaunchPass.  LaunchPass is entitled to injunctive relief, compensatory damages and other equitable and monetary relief.

162.   The wrongful acts of Defendants will continue unless enjoined.

## COUNT VIII
### Commercial Disparagement
### (Against All Defendants)

163.   LaunchPass incorporates herein by reference the allegations contained in Paragraphs 1-97 as though set forth in their entirety.

164.   Defendants have published and disseminated the aforementioned false and misleading statements regarding LaunchPass and its products and services to LaunchPass's current and prospective customers.

165.   Defendants' aforementioned false and misleading statements, which are intended to – and do – cast doubt upon the pricing and quality of LaunchPass's products and services, constitute disparagement.  Defendants made those statements with the intent to deter others from dealing with LaunchPass.

166.   Defendants intended their statements to cause pecuniary loss to LaunchPass or otherwise should have recognized that the statements would result in such pecuniary loss.

167.    Defendants' statements are not privileged or constitute an abuse of any conditional privilege that might otherwise apply.  Those statements were made with knowledge that the statements were false or were otherwise made with reckless disregard to the statements' truth or falsity.

168.    As a direct result of Defendants' aforementioned false, misleading and deceptive statements, LaunchPass has suffered damages.

**COUNT IX**
**Defamation**
**(Against All Defendants)**

169.    LaunchPass incorporates herein by reference the allegations contained in Paragraphs 1-97 as though set forth in their entirety.

170.    Defendants have published and disseminated false statements regarding LaunchPass and its products and services to LaunchPass's current and prospective customers.

171.    Defendants' false statements ascribe to LaunchPass conduct and characteristics that prejudice it in the conduct of its business and deter others from dealing with it.  As such, these statements are defamatory *per se*.

172.    Defendants made the numerous false statements at issue willfully and maliciously.

173.    Defendants' statements are not privileged or constitute an abuse of any conditional privilege that might otherwise apply.  Those statements were made with knowledge that the statements were false or were otherwise made with reckless disregard to the statements' truth or falsity.

174.    As a direct result of Defendants' false statements, LaunchPass has suffered damages, including, without limitation, special harm and actual harm to LaunchPass's reputation.

## COUNT X
## Unfair Competition
## (Against All Defendants)

175.    LaunchPass incorporates herein by reference the allegations contained in Paragraphs 1-174 as though set forth in their entirety.

176.    LaunchPass and Whop are in direct competition with one another as they provide, at least in part, similar products and services.

177.    Through their aforementioned misconduct, Defendants misappropriated valuable confidential and otherwise proprietary information belonging to LaunchPass and its customers, which LaunchPass gained through a substantial investment of time, money, resources and skill.

178.    Defendants' misappropriation was done for profit and to the detriment of LaunchPass.

179.    Defendants' conduct as described in this Complaint offends established public policy, is immoral, unethical, oppressive, unscrupulous and injurious to consumers and has unfairly neutralized a commercial advantage that LaunchPass achieved through honest labor.

180.    Defendants' misconduct constitutes unfair competition.

181.    Defendants' conduct has damaged LaunchPass and has caused, and continues to cause, irreparable harm and injury to LaunchPass.  LaunchPass is entitled to injunctive relief, compensatory damages, punitive damages and other monetary and equitable relief.

WHEREFORE, LaunchPass respectfully requests judgment as follows:

1.   That the Court declare, adjudge and decree that Defendants have committed violations of Section 2 of the Sherman Act;

2.   That the Court declare, adjudge and decree that Defendants have committed violations of the Arizona Uniform State Antitrust Act, A.R.S. § 44-1403;

3.   That Defendants and anyone acting in concert with them be enjoined and restrained permanently from engaging in predatory pricing or attempting market allocation as described herein;

4.   That the Court award damages sustained by LaunchPass on Counts I and II in an amount to be determined at trial, trebled pursuant to Section 4 of the Clayton Act, 15 USC § 15;

5.   That the Court award damages sustained by LaunchPass on Counts III and IV in an amount to be determined at trial, trebled pursuant to the Arizona Uniform State Antitrust Act, A.R.S. § 44-1408;

6.   That Defendants and anyone acting in concert with them be enjoined and restrained permanently from making any false, misleading or deceptive statements regarding LaunchPass or its products, including the dissemination in any form of the false, misleading and deceptive statements on Whop's website, marketing materials and advertisements;

7.   That Defendants be required to issue a written retraction and correction of the false, misleading and deceptive representations on Whop's website regarding LaunchPass's pricing and quality of services through media channels sufficient to reach all members of those publications' intended audience;

8.   That the Court award damages sustained by LaunchPass on Count VI in an amount to be determined at trial, trebled pursuant to 15 U.S.C. § 1117;

9.   That Defendants and anyone acting in concert with them be enjoined and restrained permanently from: (a) accessing or using LaunchPass's website, servers, or products, and any data displayed or stored therein and (b) using data or information extracted from LaunchPass's website, servers, or products for any purposes whatsoever, including, but not limited to, contact information for LaunchPass's customers;

10.   That Defendants and anyone acting in concert with them be ordered to return all documents, data, and other items, electronic or otherwise, that were wrongfully extracted from LaunchPass's website, servers, or products;

11.     That Defendants and anyone acting in concert with them be ordered to account for all profits, gains or benefits realized by Defendants arising from such misconduct;

12.     That a constructive trust by imposed by the Court over anything of value obtained by Defendants through their misconduct, such that all profits, gains, or benefits realized by Defendants arising from such misconduct is disgorged and awarded to LaunchPass;

13.     That the Court award to LaunchPass damages in an amount to be determined at trial, including, without limitation, lost profits and lost future profits;

14.     That the Court award to LaunchPass damages in the form of reasonably royalty fees with respect to all customers improperly diverted by Defendants from LaunchPass;

15.     That the Court award to LaunchPass punitive damages and costs of suit; and

16.     That the Court grant LaunchPass such other and further relief as the Court deems just and proper.

## JURY DEMAND

LaunchPass demands a trial by jury on all issues so triable.

Respectfully submitted,

DENTONS COHEN & GRIGSBY P.C.

By:  *s/ Lucy E. Hill*
Lucy E. Hill (NY 5202643)
Fridrikh V. Shrayber
(*admission pro hac vice forthcoming*)
Audrey K. Kwak
(*admission pro hac vice forthcoming*)
625 Liberty Avenue, 5th Floor
Pittsburgh, PA  15222-3152
Ph:  412-297-4900 / Fax:  412-209-1922
lucy.hill@dentons.com
fred.shrayber@dentons.com
audrey.kwak@dentons.com

*Attorneys for Plaintiff,*
*SlackPass, Inc. d/b/a LaunchPass*

Dated:  July 24, 2023
4521733