UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SLACKPASS, INC. d/b/a
LAUNCHPASS,

                    Plaintiff,

        – against –

FROSTED, INC. d/b/a WHOP, CAMERON
ZOUB, and STEVEN SCHWARTZ,

                    Defendants.

**OPINION & ORDER**

23-cv-06393 (ER)

RAMOS, D.J.:

SlackPass, Inc. d/b/a LaunchPass, an online chat community monetization provider[1], brings this action against Frosted, Inc. d/b/a Whop ("Whop"), a rival in the online chat community monetization market, Cameron Zoub ("Zoub") and Steven Schwartz ("Schwartz" and collectively, "Defendants"), alleging that Defendants violated federal and state antitrust laws, the Computer Fraud and Abuse Act ("CFAA"), and the Lanham Act, and engaged in common law disparagement and defamation, unfair competition, and tortious interference with LaunchPass' business relationships.  Doc. 60 ¶ 9.

Before the Court is Defendants' motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Doc. 66.  For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

I.    **BACKGROUND**

     **A.  Factual Background**

     The following facts are based on the allegations in the complaint, which the Court accepts as true for purposes of the instant motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

---

[1] An online chat community monetization provider creates an easy and flexible means for platform customers to monetize their influence and content online through the use of paid chat communities.  Doc. 60 ¶ 23.

Slack and Discord are two popular online chat community platforms whose customers can exchange media and communicate with each other using voice and video calls, messages and private "chats" or "communities." Doc. 60 ¶ 20. As of February 22, 2024, Slack had approximately 18 million members, and Discord had nearly 200 million. *Id.* Both Slack and Discord offer customers free membership and access to their communities. Both platforms also allow customers to create private, invitation-only communities. *Id.* ¶ 21. Certain Slack and Discord customers charge fees for other customers to join their communities and access additional content. *Id.* ¶ 22. Doing so creates a number of practical and logistical challenges for the organizers of those communities, however, including the need to authorize and restrict access, manage and track membership, process payments and track metrics. *Id.*

Founded in 2016 by Seth Lesky, LaunchPass is a Delaware corporation with its principal place of business in Arizona. *Id.* ¶ 11. LaunchPass was the first to provide an innovative program that allowed customers to manage all aspects of their fee-paying communities easily and seamlessly. *Id.* ¶¶ 2, 23. In doing so, LaunchPass created the online chat community monetization market. *Id.* ¶ 23.

LaunchPass charged its customers a 3.5% fee on each subscription-fee transaction processed by the customer, along with a flat $29 monthly fee for each community. *Id.* ¶ 24. That same pricing structure applied uniformly across the board, regardless of whether a community had 20 members or 20,000. *Id.*

LaunchPass devoted significant time, effort and resources to develop, implement and commercialize its innovative service. *Id.* ¶ 25. LaunchPass then spent years refining and improving its product, identifying and marketing its services to prospective customers, building brand loyalty, fostering relationships with its customers and maintaining customers through 24/7 customer service and competitive pricing. *Id.* As of the end of 2022, LaunchPass was servicing thousands of communities with a wide range of backgrounds, including part-time language tutors, Instagram influencers, professional

YouTube content creators, and purveyors of financial market advice. *Id.* ¶ 26. The customers paid for LaunchPass' services on a monthly basis. *Id.* ¶ 28.

LaunchPass offered its services throughout the United States and globally[2] and was limited only by the locations in which its payment processing servicer, Stripe, operates. *Id.* ¶ 27.

LaunchPass' business depended upon stable contractual relationships with its customers, who were one of its primary generators of growth in the form of positive reviews, posts, and referrals. *Id.* ¶¶ 28–29. Customers who operated online communities were unlikely to migrate from one platform to another because of: (1) the value placed on brand awareness, reputation, and customer reviews; (2) technical and logistical

---

[2] LaunchPass' terms of use provided:

**Access to the Site**

**License.** Subject to these Terms, Company grants you a non-transferable, non-exclusive, revocable, limited license to use and access the Site.

**Certain Restrictions.** The rights granted to you in these Terms are subject to the following restrictions: (a) you may access and use the Site only for lawful, authorized purposes and you shall not misuse the Site in any manner; (b) you shall not modify, make derivative works of, disassemble, reverse compile or reverse engineer any part of the Site; (c) you shall not access the Site in order to build a similar or competitive website, product, or service; and (d) except as expressly stated herein, no part of the Site may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means. Unless otherwise indicated, any future release, update, or other addition to functionality of the Site shall be subject to these Terms. All copyright and other proprietary notices on the Site (or on any content displayed on the Site) must be retained on all copies thereof. . .

**Acceptable Use Policy.**

. . . In addition, you agree not to: . . . (ii) send through the Site unsolicited or unauthorized advertising, promotional materials, junk mail, spam, chain letters, pyramid schemes, or any other form of duplicative or unsolicited messages, whether commercial or otherwise; (iii) use the Site to harvest, collect, gather or assemble information or data regarding other customers, including e-mail addresses, without their consent; (iv) interfere with, disrupt, or create an undue burden on servers or networks connected to the Site, or violate the regulations, policies or procedures of such networks; (v) attempt to gain unauthorized access to the Site (or to other computer systems or networks connected to or used together with the Site), whether through password mining or any other means; (vi) harass or interfere with any other user's use and enjoyment of the Site; or (vi) use software or automated agents or scripts to produce multiple accounts on the Site, or to generate automated searches, requests, or queries to (or to strip, scrape, or mine data from) the Site (provided, however, that we conditionally grant to the operators of public search engines revocable permission to use spiders to copy materials from the Site for the sole purpose of and solely to the extent necessary for creating publicly available searchable indices of the materials, but not caches or archives of such materials, subject to the parameters set forth in our robots.txt file).

Doc 60. ¶ 65.

difficulties of migrating all of a customer's subscribers from an platform to another; (3) economies of scale; and (4) the significant initial and continuous infusions of financial capital needed to develop and commercialize a competitive service. *Id.* ¶¶ 33–36.

Since LaunchPass was founded, only a handful of competitors with reasonably interchangeable services have entered the online chat community monetization market with integrated solutions competitive with those of LaunchPass. *Id.* ¶ 30. One such competitor, Hyper, entered the market in 2020 and attracted a sizeable customer base. *Id.* Hyper eventually accounted for an estimated 35% of the market. *Id.* As LaunchPass and Hyper continued to develop and improve their respective platforms, the market grew and attracted more customers. *Id.*

Whop is a Delaware corporation with its principal place of business in New York. *Id.* ¶ 12. Whop does business throughout the United States. *Id.* Zoub and Schwartz, two of Whop's founders and principals, are New York residents. *Id.* ¶¶ 13–15. Founded in 2021, Whop billed itself as "a marketplace where consumers can browse, discover and buy digital goods and services." *Id.* ¶ 37. After apparently learning about LaunchPass's success, Zoub and Schwartz set their sights on the online chat community monetization market. *Id.* ¶ 40. But Whop did not want to, or could not, devote the money, time and effort to build a quality product and build a reputation with their customers. *Id.* Instead, Whop allegedly determined to acquire Hyper's business. *Id.*

As a result, in early 2022, Hyper filed a complaint against Whop in this district for Whop's "improper, deceitful, unethical and unlawful tactics to build a copycat product and to steal Hyper's customers," and later settled after mediation. *See Frenzy Technologies, Inc. d/b/a Hyper Co. v. Frosted, Inc. d/b/a Whop.com*, No. 1:22 Civ. 1223 (MKV) (S.D.N.Y. Feb. 14, 2022). Not long after the settlement was reached, Hyper announced to all of its customers that, effective June 1, 2023, Hyper would be shutting down its operations and transferring its remaining customers to Whop. Doc. 60 ¶ 44. In

the meantime, Whop was in the process of securing significant seed capital to expand its operations. *Id.* ¶ 45.

Zoub purportedly "admitted" to Lesky in June, 2023, that Whop had purchased a "competitor" (presumptively Whop) for a severely depressed price because the Defendants had been successful in forcing most of Hyper's customers to "churn," i.e. to leave Hyper or force Hyper to offer its services for free. *Id.* ¶ 46.

After Hyper was eliminated, LaunchPass became the largest remaining participant in the online chat community monetization market. *Id.* ¶ 98. LaunchPass and Whop jointly accounted for over 90% of the market. *Id.* ¶ 32.

At an unspecified time, Discord also released its own monetization service but did not achieve widespread adoption due to its high price. *Id.* n.2.

Whop announced on July 20, 2023, that it had secured another $17 million in capital from a high-profile list of investors, including Insight Partners, Zinal Growth, Peter Thiel, Justin Mateen, Justin Kan, The Chainsmokers, Cory Levy, Vivek Ranadive, David Blitzer, Josh Richards, Griffin Johnson, James Harden, Kevin O'Leary, and Josh Browder. *Id.* ¶ 53. LaunchPass did not have comparable capital funding. *Id.* ¶ 97.

*Whop's Computer System Infiltration*

Starting in late 2022, Zoub, Schwartz and numerous other employees or agents of Whop signed up for various private chat communities maintained by LaunchPass customers using email accounts not affiliated with Whop. *Id.* ¶ 56–57. In so doing, Defendants allegedly were able to circumvent LaunchPass's technical barriers designed to protect their computer systems and improperly accessed those systems. *Id.* ¶ 57. Once they obtained access, Defendants employed various tactics to divert LaunchPass customers, steal LaunchPass's information, and disrupt LaunchPass's services. *Id.* ¶ 58. Zoub and Schwartz actively directed and participated in Defendants' efforts to access LaunchPass' computer systems without authorization. *Id.* ¶ 69.

However, once in LaunchPass' computer system, Defendants sent LaunchPass customers and their community members multiple unsolicited messages to induce those customers to switch their communities to Whop. *Id.* ¶ 59. Defendants made offers to dozens of LaunchPass' largest customers to switch to Whop in exchange for free services. *Id.* ¶ 60. To take advantage of those "deals" however, Whop required LaunchPass customers to grant Whop access to their administrator privileges in order to gain access to detailed information concerning their community members and to run automated commands. *Id.* Whop improperly accessed modules available only to LaunchPass' community hosts and deployed malicious code to exploit LaunchPass' "whois" command[3] to access customers' subscription information and to disrupt and overload LaunchPass' servers. *Id.* ¶ 62. Whop and its employees also bombarded LaunchPass customers with direct, unsolicited messages and urged them to leave LaunchPass. *Id.* ¶ 5. Whop also deployed code to "scrape" the confidential and proprietary information of the community hosts and their members in order to induce those customers to migrate to Whop. *Id.* ¶¶ 5, 61. Whop's code also disrupted and overwhelmed LaunchPass' customer support resources and caused customers to believe that its services were not functioning properly. *Id.* ¶ 5.

As part of this effort, Ethan Rotstein, Whop's head of growth, signed up with LaunchPass claiming that he was "looking to set up [a] new [D]iscord cook group." *Id.* ¶ 64. Rotstein then submitted numerous inquiries to LaunchPass customer success specialists to inquire about LaunchPass' upcoming technological plans and capabilities. *Id.*

As a result of Defendants' conduct, LaunchPass incurred tens of thousands of dollars in damages, including the cost and expense of detecting and responding to the Defendants' attacks and unauthorized access. *Id.* ¶ 70. LaunchPass spent hundreds of

---

[3] The parties do not define what the "whois" command is, nor describe the significance of the command in this context.

hours assessing the resulting damage to its services and debugging and restoring its systems.  *Id.*

*Whop's False Advertising*

After identifying LaunchPass customers, the Defendants began directly soliciting those customers with false and misleading marketing materials about LaunchPass' pricing and services.  *Id.* ¶ 71.  Zoub, Schwartz, and other Whop employees repeated the misrepresentations in dozens of direct written communications and telephone calls with current and prospective LaunchPass customers as part of their campaign to divert LaunchPass customers to Whop.  *Id.* ¶ 82.

For example, on Whop's website, it falsely stated that LaunchPass is "charging ~2%+ more than Whop on each transaction."[4]  *Id.*  In fact, LaunchPass charged a 3.5% fee per transaction, along with a flat fee of $29 per month per community.[5]  *Id.* ¶ 72. Comparably, as of July 24, 2023, Whop charged different fees depending on whether Whop served as the "Merchant of Record" ("MoR"), or whether the client used Stripe for its payments.  *Id.* ¶ 73.  When Whop was the MoR, Whop charged a fee of 4.5% plus 40 cents.  *Id.*  For customers using Stripe, Whop charged 3%.  *Id.*  By February 22, 2024, Whop changed its pricing to 3% "plus payment process fees" when Whop was the MoR, and 3% for customers using Stripe.  *Id.* ¶ 75.  In other words, LaunchPass did not charge 2% more than Whop, regardless of whether Whop served as the MoR.

In its direct marketing and solicitation activities, Whop falsely informed multiple LaunchPass customers that LaunchPass was now providing its services to other customers "free of charge."  *Id.* ¶ 76.  This led to a sudden and substantial surge in demand from LaunchPass customers seeking 0% fees.  *Id.*

---

[4] As of February 22, 2024, Defendants have removed that page from public view.  Doc. 60 ¶ 65.

[5] This fee was waived for smaller communities for whom the $29 fee presented a hardship.  Doc. 60 ¶ 72.

Whop also published an advertisement on its "blog" entitled "The #1 LaunchPass Alternative for Discord Monetization & Management: Whop." *Id.* ¶ 77. That advertisement contained the following statements:

> (1) Launchpass has a reputation for leaving creators out in the cold when they need the support most.
>
> (2) Launchpass fails to meet creator expectations in customer support. And they charge higher fees than many are willing to stomach.
>
> (3) The last thing you want is for a member to have an issue with billing and have your delicate ecosystem start to crumble. But unfortunately, this is an experience Launchpass creators are all too familiar with.

*Id.*

The Whop marketing page also contained the following representation concerning fees: "At Whop, we charge 3% across the board. That's it. This is lower than the 3.5% you pay on Launchpass—and that's not even considering the $29/month!" *Id.* ¶ 79. However, Whop's website indicated that it charged customers 30% in additional fees with respect to any community member who joined the community through Whop's own homepage ("Marketplace"): "If a customer buy[s] from the Whop [M]arketplace, we will take a 30% fee on that transaction. *Id.* ¶ 80. This is because Whop is technically acting as an affiliate and generated that sale for your company." *Id.* Accordingly, for any community member who signs up for a Whop community through Whop's homepage, Whop's fee is actually 33%. *Id.* ¶ 81.

### Whop's Predatory Pricing Scheme

When Defendants directly solicited LaunchPass customers, they did not offer those customers the fees that Whop advertised on its website, i.e., 4.5% plus 40 cents when Whop is MoR, and 3% for customers using Stripe. *Id.* ¶ 86. Instead, Defendants offered to provide them with Whop's services for free for a period of one or two years, and sometimes longer, but in exchange, specifically required LaunchPass customers to reveal the terms of their contracts with LaunchPass. *Id.* ¶ 87.

In numerous instances, Defendants coupled their "free services" proposal to existing LaunchPass customers with offers of direct remuneration, including trips and "signing bonuses" in amounts of up to $10,000, in exchange for switching to Whop. *Id.* ¶ 88. If Whop was unable to convince a LaunchPass customer to switch, Defendants encouraged those customers to demand free services from LaunchPass to stay with LauchPass, using Whop's offer as "leverage." *Id.* ¶ 94.

As a result of the foregoing efforts, more than 100 LaunchPass customers switched to Whop.[6] *Id.* ¶ 90. The customers LaunchPass lost accounted for more than $100,000 in monthly revenue. *Id.* ¶ 91. LaunchPass also lost potential referral opportunities from those customers. *Id.* ¶ 92. Whop publicly boasted about the customers that it had diverted form LaunchPass on its Twitter feed. *Id.* ¶ 90.

*Whop Lured Away LunchPass' Top Customer Service Representative*

Daniel Nguyen was LaunchPass' top customer service representative and had extensive contact with LaunchPass' largest and most critical accounts on a daily basis. *Id.* ¶¶ 99, 102. In April 2023, Defendants approached Nguyen and made him a lucrative offer, more than doubling his salary. *Id.* ¶ 99. After Nguyen initially rejected the offer, Whop promised to beat whatever offer LaunchPass would make to retain him. *Id.* Nguyen eventually left LaunchPass for Whop. *Id.* ¶ 100.

In his exit interview, Nguyen told LaunchPass that he was being hired as a "project manager," a role with which Nguyen had no professional experience. *Id.* ¶ 100. Nguyen was in fact hired as an account manager for Whop and touted his ability to "foster" and "maintain" relationships with "top-tier customers." *Id.*

After Nguyen's departure from LaunchPass, Whop was able to divert LaunchPass' largest and most critical accounts in significant numbers and at a rapid pace. *Id.* ¶ 102.

---

[6] LaunchPass provides a full list of the lost customers in its complaint. Doc. 60 ¶ 90.

*Zoub "Admits" to Defendants' Scheme*

On June 3, 2023, after Whop's efforts to divert its customers was well underway, Zoub called Lesky and informed him that LaunchPass had only one of three options:  (1) transfer its customers to Whop in exchange for an ongoing "royalty fee" for several years; (2) sell its business to Whop at a severely depressed price; or (3) face the prospect of imminent collapse as a result of Defendants' continued improper predatory pricing and "churning" campaign.  *Id.* ¶ 109.

Zoub reiterated the three options via email on June 4, 2023.  *Id.* ¶ 111.  As to Option 1, Zoub proposed "something along the lines of a 60/40 (40% to you) split would probably work for us and for call it 3 years."  *Id.*  As to Option 2, Zoub warned Lesky that the longer LaunchPass resisted, the lower the Defendants' purchase price would become—as was the case with Hyper:  "[W]e just purchased another company in the space that had a lot of their customers churning and joining Whop and they sold us their company at a 6-month multiple given how little was remaining, but I know you guys have quite a bit more customers than them so I imagine it would be more than that."  *Id.* ¶ 112.  As to Option 3, Zoub reiterated that the Defendants will "do whatever it takes to get as many businesses on Whop," noting that "options #1 and #2 would save both parties a lot of time and have all parties walk away happy."  *Id.* ¶ 113.

On June 14, 2023, LaunchPass' counsel sent Whop a letter demanding that Whop cease and desist its anticompetitive behavior, and requested that Whop provide assurances that Whop would cease such behavior by June 19, 2023.  *Id.* ¶ 114.  The letter also demanded that Whop cease improperly accessing LaunchPass' computer system to solicit customers.  *Id.*  Whop did not respond to the letter.  *Id.* ¶ 115.  In fact, Rotstein and others allegedly continued to sign up for and access LaunchPass' platform improperly in order to solicit customers and make false statements about LaunchPass, its services and its business practices.  *Id.* ¶ 116.

*Whop's Continued Access to LaunchPass' Computer System*

On July 24, 2023, LaunchPass filed the instant lawsuit against Whop, Zoub and Schwartz. *Id.* ¶ 118; Doc. 1.

Defendants initially appeared to temporarily limit their improper access and use of the LaunchPass platform. *Id.* ¶ 120. Soon after, however, Defendants renewed and accelerated their attacks, both directly and through others acting in concert with them. *Id.* ¶ 121.

LaunchPass' server logs reflect repeated improper sign-ups, contacts, logins, and visits by the Defendants, including more than 100 attempts in the first week of November 2023 alone, originating from the same IP address previously used by Rotstein, to communities run by LaunchPass' largest, most profitable customers, which LaunchPass referred to as "VIPs." *Id.* ¶ 122. Many instances of this improper access were also initiated by an individual using the email address surya@whop.com. *Id.* According to LinkedIn, this individual was a Whop "account executive," Surya Veeravalli. *Id.* ¶ 123. In early November 2023, that same individual began using a personal Gmail address (suryaveeravalli1@gmail.com) and Discord username "sundawg3199 (SCOOBNOOb)." *Id.* ¶ 124.

In late November 2023, LaunchPass contacted several Whop employees, including Rotstein, via email and specifically warned each to cease and desist their improper access of the LaunchPass platform. *Id.* ¶ 132. Despite these warnings, Defendants continued to access LaunchPass' computer system. *Id.* ¶ 133.

On December 22, 2023, LaunchPass again contacted Defendants through counsel and demanded that they and their agents immediately cease and desist their improper access of LaunchPass' platform. *Id.* ¶ 134.

In a letter dated February 5, 2024, Defendants' counsel represented that "as of receipt of LaunchPass' December 22, 2023 letter, the Whop Defendants ceased accessing LaunchPass' purported platform or services." *Id.* ¶ 135. That letter also claimed that

"LaunchPass had never previously demanded that the Whop Defendants cease accessing LaunchPass' purported platform or services." *Id.*

*Whop's Continued Predatory Pricing Tactics*

After LaunchPass filed its original complaint, Whop continued its predatory pricing tactics. *Id.* ¶ 136.

For example, Whop began offering to pay LaunchPass customers a percentage—sometimes as high as 30%, and for as long as six months—of those customers' monthly recurring revenue ("MRR") generated on the Whop platform. *Id.* ¶ 137.

Starting September 2023, Whop offered to pay a LaunchPass VIP an additional 30% of their MRR for 6 months.[7] *Id.* ¶¶ 138–143. The VIP then demanded that LaunchPass either match the offer or lose his business. *Id.* ¶ 142. LaunchPass was not able to match the offer or similar ones with other LaunchPass customers. *Id.* ¶¶ 141, 143.

Whop offered another LaunchPass customer an even more generous offer, consisting of: (1) two months of free service; (2) a 0.5% monthly fee for an *indefinite* period of time; and (3) a $10,000 upfront signing bonus. Docs. 39-1 ¶ 35; 39-9; 60 ¶ 144. This offer also included 30% fees for Marketplace sales that Whop would charge. Doc. 60 ¶ 80.

Many VIPs left LaunchPass. *Id.* ¶¶ 143, 145. Whop advertised that a number of then-current LaunchPass customers were "coming soon." *Id.* ¶ 151.

Whop meanwhile continued to charge its non-LaunchPass customers its standard, listed rates. *Id.* ¶ 89.

---

[7] For example, if the VIP were to earn $10,000 in one month from its paid online community, Whop's offer meant that *Whop* would pay that customer $3,000 every month. Doc. 60 ¶ 138. Even if Whop were charging that customer what it claimed on its website to charge its other customers—3% to 4.5% per transaction, or $300 to $450 per month—that offer results in a net monthly *loss* to Whop of 26.5% to 27% per month. *Id.* ¶ 139. This would result in a total net loss of $18,000 in revenue of $1,800 to $2,640 to Whop during a period of 6 months. *Id.* ¶ 140.

### B. Procedural History

LaunchPass filed the instant lawsuit on July 24, 2023 and filed an amended complaint on February 22, 2024. Docs. 1, 60. LaunchPass alleges 10 claims: predatory pricing pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count 1); attempted monopolization pursuant to Section 2 of the Sherman Act (Count 2); predatory pricing pursuant to Arizona Uniform State Antitrust Act, A.R.S. § 44-1403 (Counts 3); attempted monopolization pursuant to Arizona Uniform State Antitrust Act (Count 4); CFAA, 18 U.S.C. § 1030 (Count 5); Lanham Act, 15 U.S.C. § 1125 (Count 6); tortious interference with existing and prospective contractual relationships (Count 7); commercial disparagement (Count 8); defamation (Count 9); and unfair competition (Count 10). *Id.* ¶¶ 163–250.

Defendants moved to dismiss the amended complaint in its entirety on March 14, 2024. Doc. 65. Defendants argue that each allegation fails to state a claim. *Id.*

## II. LEGAL STANDARD

### 1. Rule 12(b)6 Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F.Supp.2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits'" or "weigh[ing] the evidence that might be offered to support it." *See Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *See Doe v. N.Y. Univ.*, 20 Civ. 1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

## III.    DISCUSSION

### A.  The Court Will Consider the Offer Exhibit Filed by LaunchPass and the Connected Exhibit Filed by Whop

As a preliminary matter, Defendants ask the Court to consider two exhibits that LaunchPass used in support of their motion for preliminary injunction: (1) Whop's offer with a LaunchPass VIP in the form of text messages, Doc. 39-8; and (2) the actual offer agreement that Whop made to a particular customer, Doc. 39-9. Doc. 66 at 11–12. Defendants also ask the Court to consider information concerning Whop's website referenced in an exhibit concerning the offer made to the same LaunchPass VIP. Docs. 66 at 11–12; 67-5. LaunchPass does not object to the Court's consideration of the documents. *See generally* Doc. 72.

In adjudicating a motion to dismiss, a court may consider only the complaint, exhibits to the complaint, any statements or documents incorporated in it by reference, and documents integral to it.  *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013)).  Where a document is partially quoted in a complaint, the Court may generally consider its full text.  *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 808 (2d Cir. 1996).

Where a document is not incorporated by reference, the court may nonetheless consider it where the complaint "relies heavily upon its terms and effect," thereby rendering the document "integral" to the complaint.  *Cheng v. T.D. Bank, N.A.*, No. 21 Civ. 3282 (BMC), 2022 WL 2316175, at *2 (E.D.N.Y. June 28, 2022) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).  However, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."  *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006).  "It must also be clear that there exist[s] no material disputed issues of fact regarding the relevance of the document." *Id.*

The complaint explicitly referenced Whop's offers to customers including one specific VIP in the complaint, Doc. 39-8, and another to a different customer, Doc. 39-9.  Doc. 60 ¶¶ 137–144.  These two offers were attached by LaunchPass in support of its motion for preliminary injunction that it later withdrew.  Docs. 39, 50.  The Court may consider them in full text.  *See Philip Morris Companies*, 75 F.3d at 808.  Whop's offer to the VIP in the form of text messages stated that "this deal is going out to everyone . . . [and is] on [Whop's] website."  Doc. 39-8 at 3.  Whop's website provided that "Whop will pay the Affiliate an amount equal to a percentage of Whop's *net revenue*" (emphasis added), instead of a percentage of the MRR as alleged in the complaint.  Doc. 67-5 at 15.  The information concerning Whop's website is integral to the complaint because it was the terms and conditions of Whop's offer explicitly referenced in the complaint, which

described the amount of the signing bonus, on which the complaint relied.  *See Cheng*, 2022 WL 2316175, at *2.

Accordingly, the Court may properly consider the proposed offers and website information.

### B. Predatory Pricing Claims

LaunchPass asserts predatory pricing claims under both Section 2 of the Sherman Act (Count 1) and under the Arizona Uniform State Antitrust Act (Count 3).  Doc. 60 ¶¶ 163–171, 182–190.

To establish predatory pricing, a plaintiff must prove:  "(1) that the prices complained of are below an appropriate measure of its rival's costs; and (2) that the predatory rival has a dangerous probability of recouping its investment through a below cost pricing scheme."  *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 339 (E.D.N.Y. 2014) (quoting *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 266 (2d Cir.2001)) (internal quotation marks and citation omitted).

In the Sherman Act context, "predatory pricing schemes are rarely tried, and even more rarely successful . . . and the costs of an erroneous finding of liability are high." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226–27 (1993). "[T]he mechanism by which a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition; because 'cutting prices in order to increase business often is the very essence of competition . . . [M]istaken inferences . . . are especially costly, because they chill the very conduct the antitrust laws are designed to protect.'"  *Id.*

### a. Appropriate Measure of Cost

To establish the defendant's prices are below an appropriate measure of its cost, a plaintiff must plausibly allege that the defendant's prices are below the defendant's "reasonably anticipated marginal cost," i.e. the cost resulting from producing an additional increment of output, *United States v. AMR Corp.*, 335 F.3d 1109, 1115 (10th

Cir. 2003), or, when that is not available, below the defendant's "reasonably anticipated average variable cost," which is dependent on the firm's output, excluding fixed costs. *Kelco Disposal, Inc. v. Browning-Ferris Industries of Vermont, Inc.*, 845 F.2d 404, 407 (2d Cir. 1988), aff'd, 492 U.S. 257 (1989).

LaunchPass argues that the appropriate measure of Whop's costs is the "average variable cost," which is used as an alternative when the "reasonably anticipated marginal cost" is not available. Doc. 72 at 16–17. However, LaunchPass does not indicate why Whop's "anticipated marginal cost" was not available. *See Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.*, 926 F. Supp. 371, 375 n.5 (S.D.N.Y. 1996) ("The lack of correspondence between usual accounting measures of cost and marginal cost is . . . the basis for the widespread use of average variable cost as a surrogate for marginal cost."). Accordingly, the Court will analyze the predatory pricing claims by reference to Whop's "anticipated marginal cost." *Kelco Disposal*, 845 F.2d at 407.

Additionally, irrespective of which cost is used as the approximate measure of Whop's cost, LaunchPass does not provide a basic range of *either* the anticipated marginal cost *or* the average variable cost, in order to compare with the prices charged by Whop to establish predatory pricing. *See Astra Media v. Clear Channel Taxi Media*, 414 F. App'x 334, 336 (2d Cir. 2011) (dismissing predatory pricing claim because the complaint included no allegations about the defendant's "actual costs," but instead relied on "conclusory" allegations that the defendant's prices were below its costs).

Whop alleges that LaunchPass has not plausibly alleged that Whop's prices were below Whop's marginal cost, which "approaches zero." Doc. 66 at 18. LaunchPass argues that Whop's marginal cost must therefore be greater than zero. Doc. 72 at 18. LaunchPass therefore bears the burden to plausibly allege that Whop's listed prices were lower than Whop's marginal cost which was greater than zero. *Kelco Disposal*, 845 F.2d at 407. However, LaunchPass does not plausibly allege how Whop's prices were lower Whop's marginal cost.

Merely alleging that a defendant charges a lower fee for a specific service than the plaintiff does is insufficient to establish a predatory pricing claim. *See Taylor Publishing Co. v. Jostens, Inc.*, 216 F.3d 465, 479 (5th Cir. 2000) (holding that a plaintiff's allegation that the defendant's prices dropped below its average variable cost with respect to one product was insufficient to establish predatory pricing). Here, LaunchPass points to Whop's offer to one specific LaunchPass customer to argue that an indefinite 0.5% monthly fee was "below-cost." Docs. 39-9; 60 ¶ 144. However, LaunchPass does not explain how that 0.5% monthly fee was below-cost when the purported marginal cost was close to zero. Additionally, that same offer listed a 30% fee on Marketplace sales. Doc. 39-9 at 3. Therefore, instead of a "pric[e] of 0%" that Whop allegedly charged according to the complaint, Doc. 60 ¶ 89, Whop's offer included an additional price of 30% fee on Marketplace sales. LaunchPass does not explain how Whop's *overall* marginal cost or average variable cost was higher than the price of the offer.

LaunchPass also argues that Whop's offer to other LaunchPass customers included that Whop would pay a number of LaunchPass VIPs additional 30% of his MRR for 6 months. *Id.* ¶¶ 137–143. LaunchPass therefore concludes that even if Whop charged that customer 3% to 4.5% per transaction, that offer would still result in a net monthly loss to Whop of 26.5% to 27% per month. *Id.* ¶ 139. Defendants contend that the 30% bonus was not based on the customer's MRR, but instead Whop's "net revenue" from the customer's MRR. Doc. 66 at 12; 67-5 at 15. LaunchPass does not respond to Defendants' contention. Additionally, even if this particular offer is evidence of underpricing, the amended complaint concedes that Whop charged its non-LaunchPass customers its standard, listed rates. Doc. 60 ¶ 89. LaunchPass also does not indicate how many customers received this offer. This is insufficient to establish predatory pricing. *See Taylor Publishing*, 216 F.3d at 478 (quoting *Stearns Airport Equipment Co. v. FMC Corp.*, 170 F.3d 518, 529 (5th Cir. 1999) (holding that five underpriced bids out of a total of between 240 and 400 bids was insufficient to establish predatory pricing)).

Overall, LaunchPass only makes conclusory allegations that Whop's "pricing structures" were below cost.  *See Astra Media v*, 414 F. App'x at 336 (dismissing predatory pricing claim because the complaint included no allegations about the defendants "actual costs," but instead relied on "conclusory" allegations that the defendant's prices were below its costs).  Accordingly, the first prong of a predatory pricing claim is not established.

### b.  *Probability of Recoupment*

To weigh the dangerous probability of recoupment, the Court examines "the extent and duration of the alleged predation, the relative financial strength of the predator and its intended victim, and their respective incentives and will."  *Brooke Group Ltd.*, 509 U.S. at 210; *A N D Carting, LLC v. Finocchio Brothers*, No. 3:07 Civ. 164 (CFD), 2010 WL 3489980, at *3 (D. Conn. Aug. 31, 2010).  Relevant to this analysis are whether the market is highly diffuse and competitive, whether new entry is easy, and whether the defendant lacks adequate excess capacity to absorb the market shares of his rivals and is unable to quickly create or purchase new capacity.  *Brooke Group Ltd.*, 509 U.S. at 226.

LaunchPass argues that Whop could recoup its short-term losses by raising its prices once it became the only remaining material participant in the market.  Doc. 60 ¶¶ 98, 147, 157–159, 167, 186.  However, Defendants argue that LaunchPass does not allege that Whop had a sufficient market share to recoup its short-term losses, identify the competitors in the market or a basis for identifying them, or allege the current market share of any competitor within the purported market.  Doc. 66 at 20.

The complaint does not specify Whop's individual market share.  Instead, the complaint alleges that Hyper accounted for an estimated 35% of the market before its customers were acquired by Whop and that Whop and LaunchPass jointly accounted for over 90% of the market.  Doc. 60 ¶¶ 30, 98.  Even though a monopoly power can be established when the defendant's market share is below 50%, *Hayden Publishing Co., Inc. v. Cox Broadcasting Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984), here the complaint

19

does not explicitly allege that the 35% of the market Whop presumptively acquired from Hyper translates into a market share for Whop of greater than 35%. In any event, this figure alone is not sufficient to establish a dominant share of the relevant market. *Virgin Atlantic Airways Ltd.*, 257 F.3d at 266 ("Predatory pricing is a means by which 'a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in.'").

In *United States v. Waste Management, Inc.*, the Court found that a projected 48.8% market share of company after merger was insufficient to demonstrate monopoly power because the barriers to entry were insubstantial. 743 F.2d 976, 984 (2d Cir. 1984). Here, LaunchPass similarly fails to plausibly allege substantial barriers to enter the purported market.

LaunchPass provides several reasons why migrating from one platform to another is not easy for the customers: (1) the value placed on brand awareness, reputation, and customer reviews; (2) technical and logistical difficulties of migrating all of a customer's subscribers from an platform to another; (3) economies of scale; and (4) the significant initial and continuous infusions of financial capital needed to develop and commercialize a competitive service. Doc. 60 ¶¶ 33–36. However, these obstacles did not seem to deter other companies from entering into the market. Hyper entered in 2020 and quickly occupied 35% of the market; Whop entered and grew by allegedly acquiring Hyper's business by improper means; Discord also entered the market as a rival. Doc. 60 ¶¶ 30–32. While the complaint also explains that Whop obtained a $17 million capital investment in July 2023, and that LaunchPass did not have comparable capital financing, the complaint does not describe whether Hyper or other competitors entered into the market with similarly robust investment. Additionally, the Court notes that based on LaunchPass' allegations, Whop acquired Hyper in June 2023, before it "secured" the $17

million investment in July 2023.[8]  *Id.* ¶¶ 31, 53.  This weighs against with the allegation that "significant initial and continuous infusions of financial capital" are needed for successful entry.  *See Affinity LLC v. GfK Mediamark Research & Intelligence, LLC,* 547 F. App'x 54, 56 (2d Cir. 2013) (finding that "remarkably low barriers to entry in the market" is shown if "small, undercapitalized startup[s] can create a foothold in the [purported market] in a matter of months and for a relatively minor investment"); Doc. 72 at 21.  The complaint therefore does not plausibly allege that there are substantial barriers to entry.

Because neither of the prongs necessary to establish predatory pricing is met, the predatory pricing claims are dismissed.

### C.  Attempted Monopolization Claims

LaunchPass asserts attempted monopolization claims under both Section 2 of the Sherman Act (Count 2) and under the Arizona Uniform State Antitrust Act (Count 4). Doc. 60 ¶¶ 172–181, 191–200.

To state an attempted monopolization claim, a plaintiff must prove that:  (1) the defendant has engaged in predatory or anticompetitive conduct; (2) with a specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  Proof of the first element of an attempted monopolization claim, anticompetitive or exclusionary conduct, may be used to infer the second element, specific intent to monopolize; and when coupled with proof of monopoly power, evidence of anticompetitive conduct may demonstrate a dangerous probability of success.  *Volvo North America Corp. v. Men's International Professional Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988) (citing *Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76, 85 (2d Cir.1981), *cert. denied,* 455 U.S. 943 (1982)).

---

[8] While the complaint is ambiguous as to precisely when Whop secured the investment, LaunchPass does not dispute Defendants' argument that Whop secured the $17 million only after acquiring Hyper.  *See* Doc. 66 at 13, 21; *see generally* Doc. 72.

*a. Anticompetitive Conduct*

LaunchPass argues that Defendants' anticompetitive conduct includes the alleged predatory pricing scheme and Zoub's communications with Lesky in July 2023, in which he communicated his intention to take over LaunchPass.  Doc. 72 at 23.

To establish anticompetitive conduct through predatory pricing pursuant to Section 2 of the Sherman Act, the plaintiff must show that "the defendant lowered its prices "below an appropriate measure of its . . . costs" in circumstances where there exists "a dangerous probability" that the defendant will recoup later.  *City of Long Beach v. Total Gas & Power North America, Inc.*, 465 F. Supp. 3d 416, 446–47 (S.D.N.Y. 2020), aff'd, No. 20 Civ. 2020, 2021 WL 5754295 (2d Cir. Dec. 3, 2021) (quoting *Brooke Group Ltd.*, 509 U.S. at 222).  As discussed, the Court has found that LaunchPass does not plausibly allege that Defendants engaged in predatory pricing.

LaunchPass additionally alleges that Zoub explicitly proposed that LaunchPass exit the market and allocate its customers to Whop.  Doc. 60 ¶ 111.  While the parties do not expressly use this term, Zoub's communications with Lesky in July 2023 can reasonably be interpreted as an attempt to enter into a horizontal agreement with LaunchPass to allocate the market.  A horizontal agreement is an agreement among competitors to eliminate competition by allocating markets, which is a per se violation of the Sherman Act.  *See New York ex rel. Spitzer v. Saint Francis Hospital*, 94 F. Supp. 2d 399, 414 (S.D.N.Y. 2000) (quoting *United States v. Topco,* 405 U.S. 596, 608 (1972)). Here, Zoub explicitly asked to Lesky to "transfer [hi]s customers to Whop in exchange for an ongoing 'royalty fee' for several years."  Doc. 60 ¶ 109.  Specifically, Zoub proposed that "something along the lines of a 60/40 (40% to you) split would probably work for us and for call it 3 years."  *Id.* ¶ 111. As the complaint further explains:  "[i]n other words, Zoub explicitly proposed that LaunchPass exit the market and allocate its customers to Whop."  *Id.*  This plausibly alleges that Whop proposed to enter into an

agreement with LaunchPass to allocate the market and eliminate competition, in violation of antitrust law.

Accordingly, the complaint plausibly alleges anticompetitive conduct by Defendants.

      *b.  Specific Intent to Monopolize*

While "the completed offense of monopolization requires only a general intent, 'a specific intent to destroy competition or build [a] monopoly is essential to guilt for the mere attempt.'" *In re Tether & Bitfinex Crypto Asset Litigation*, 576 F. Supp. 3d 55, 100 (S.D.N.Y. 2021) (quoting *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 101 (2d Cir. 1998)) (internal quotation marks and citation omitted).

"Claims for attempted monopolization . . . require factual allegations from which the [c]ourt can plausibly infer that [d]efendants have a specific intent to monopolize." *Michael E. Jones M.D., P.C. v. UnitedHealth Group, Inc.*, No. 19 Civ. 7972, 2020 WL 4895675, at *30 (S.D.N.Y. Aug. 19, 2020). "[E]xplicit attestations of specific intent to build monopoly or to exclude competitors" is not required. *See In re Tether & Bitfinex Crypto Asset Litigation*, 576 F. Supp. 3d at 100. Specific intent can be "reasonably infer[red]" from defendants' uneconomic conduct, which a jury could determine "was not motivated by a valid business justification." *See Tops Markets*, 142 F.3d at 101–102 (finding that the defendants had specific intent to monopolize when they paid "a very substantial premium" for undevelopable lands when they had other more profitable options).

Zoub's communications with Lesky in July 2023 plausibly establish Defendants' specific intent to monopolize. As analyzed above, Zoub's three-option proposal plausibly amounted to an agreement to allocate the market and "eliminate competition or build [a] monopoly." Doc. 60 ¶ 111 ("[S]omething along the lines of a 60/40 (40% to you) split would probably work for us and for call it 3 years.").

Accordingly, the complaint therefore sufficiently alleges Whop's specific intent to monopolize.

### c.  Probability of Monopolization

To evaluate whether there is a "dangerous probability" of monopolization, the court considers Whop's economic power in the relevant market.  *See All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*, 596 F. Supp. 2d 630, 642 (E.D.N.Y. 2009) (quoting *Tops Markets*, 142 F.3d at 100).  "Monopoly or market power has been defined as the power to control prices or exclude competition in the relevant market.  Market power may be inferred from a predominant share of the market but may also exist when an entity does not have a majority of the market share."  *See Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 578–79 (S.D.N.Y. 2011) (quoting *Syncsort Inc. v. Sequential Software, Inc.,* 50 F.Supp.2d 318, 329 (D.N.J.1999)) (internal citation omitted).

The relevant market is defined as "all products reasonably interchangeable by consumers for the same purposes."  *Regeneron Pharmaceuticals, Inc. v. Novartis Pharma AG*, 96 F.4th 327, 338 (2d Cir. 2024) (internal citation and quotation marks omitted).  "At the motion-to-dismiss stage, a plaintiff's proposed relevant market must 'bear a rational relation to the methodology courts prescribe to define a market' and include a 'plausible explanation as to why a market should be limited' to exclude possible substitutes."  *Id.* at 338.  "This is a relatively permissible pleading standard."  *Id.* at 339.  To determine the boundaries of a product market, we look to "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Id.*  Two products are reasonably interchangeable where "consumers would respond to a slight increase in the price of one product by switching to another product."  *Id.*  The Supreme Court has cautioned that identifying the scope of a relevant market requires resolving empirical questions that "can be determined only after a factual inquiry into the commercial realities faced by consumers."  *Id.* (quoting *Eastman Kodak Co. v. Image*

*Technology Services, Inc.*, 504 U.S. 451, 482 (1992)). Courts have therefore recognized that "market definition is a deeply fact-intensive inquiry," and "hesitate to grant motions to dismiss for failure to plead a relevant product market." *Regeneron Pharmaceuticals*, 96 F.4th at 339. Motions to dismiss should generally not be granted in such cases except "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products." *Id.*

Defendants argue that LaunchPass does not adequately define the relevant market. Doc. 66 at 25. However, the complaint defines the online chat community monetization market as a market with "program[s] that allow[] users easily and seamlessly to manage all aspects of their paid communities . . . (providing) an easy and flexible means for anyone to monetize their influence and content online through the use of paid chat communities." Doc. 60 ¶ 23. Additionally, the complaint describes the market as "nascent" and with "only a handful of competitors with reasonably interchangeable services," including Hyper, Whop, and Discord. *Id.* ¶ 30–32. The Court finds that LaunchPass has adequately defined the market at this juncture.

"Once the relevant market is determined, we consider a variety of factors in addition to defendant's market share, including the strength of competition, barriers of entry, and the probable development of the market." *Bayer Schering Pharma AG*, 813 F. Supp. 2d at 579 (quoting *AD/SAT, Division of Skylight v. Associated Press*, 181 F.3d 216, 226–272 (2d Cir. 1999)).

The Second Circuit has held that a 33% market share does not approach the level required for a showing of dangerous probability of monopoly power. *See AD/SAT,* 181 F.3d at 229 (quoting *Nifty Foods Corp. v. Great Atlantic and Pacific Tea Co.*, 614 F.2d 832, 841 (2d Cir.1980)). "It would appear rather difficult to establish the dangerous probability element where a defendant holds less than a 40% share of a market, unless

other factors indicate the market share figures understate the market power held by the defendant." *See AD/SAT*, 181 F.3d at 229 (quoting Thomas V. Vakerics, Antitrust Basics, § 5.03, at 5–23).

The complaint does not specify Whop's market share *at the time* of the alleged anticompetitive conduct, only that Whop purchased Hyper, which at an unspecified time, had a market share of 35%. Doc. 60 ¶ 30 ("Hyper entered the market in 2020 and attracted a sizeable customer base, and eventually grew to account for an estimated 35% of the Market."). The complaint does not provide Hyper's market share at the time it was acquired by Whop or whether Whop's market share after it acquired Hyper was over 40%. *See AD/SAT*, 181 F.3d at 229. The Court has also found that the complaint does not plausibly allege that the barriers of entry into the market were high.

However, the complaint explains that Whop obtained a $17 million capital investment in July 2023, and that LaunchPass did not have comparable capital financing. Doc. 60 ¶¶ 96–97. This, combined with the fact that all of the other competitors accounted for less than 10% of the market, plausibly establishes that Whop had a dangerous probability of achieving monopoly power. *Id.* ¶ 32. Because "the complaint alleges both exclusionary conduct and the existence of monopoly power, the third element, a dangerous probability of success, may be inferred." *Volvo North America Corp.*, 857 F.2d at 74.

Accordingly, LaunchPass plausibly establishes attempted monopolization claims.

### D. CFAA Claim

The CFAA is a criminal statute that subjects to criminal liability anyone who "intentionally accesses a computer without authorization or exceeds authorized access." 18 U.S.C. § 1030(a)(2). It creates a limited private right of action when a violation results in a cognizable "loss" of at least $5,000. *See* 18 U.S.C. § 1030(g). Defendants argue that: (1) LaunchPass' CFAA claim is foreclosed by *Van Buren v. United States*, 593

U.S. 374 (2021); and (2) LaunchPass does not plausibly allege a cognizable loss in excess of $5,000.  Doc. 66 at 30–34.

In *Van Buren*, a former police officer conducted a license-plate search in a law enforcement computer database in exchange for money.  593 U.S. at 378.  The Supreme Court found that CFAA did not apply to Van Buren's conduct even though he had "improper motives for obtaining information that is otherwise available" to him.  *Id.*  The Court clarified that CFAA targets "intentional[] access[] [of a] computer without authorization or exceeds authorized access," which includes both "access[ing] a computer without any permission at all" and "entering an area of the computer to which [that] authorization does not extend."  *Id.* at 389–90.  "If the 'exceeds authorized access' clause criminalizes every violation of a computer-use policy, then millions of otherwise law-abiding citizens are criminals."  *Id.* at 394.

Here, the complaint alleges that Defendants:  (1) deployed code into LaunchPass' computer system to exploit the "whois" command to access customers' subscription information; and (2) accessed portions of the platform only accessible to LaunchPass customers with non-Whop email accounts.  Docs. 60 ¶¶ 5, 56–70, 120–129.  It is unclear whether the customers' subscription information is available only to LaunchPass community hosts or not.  *Id.* 60 ¶ 62.  Assuming that the customers' subscription information is not available to all LaunchPass community members, Defendants' conduct plausibly violated the CFAA.  *See Van Buren*, 593 U.S. at 389 (holding that the CFAA targets "so-called outside hackers—those who 'acces[s] a computer without any permission at all'").  If Defendants had access to portions of LaunchPass' system that was available all of its customers, this would not be a violation pursuant to the CFAA.  *Id.* at 396 ("[L]iability under both clauses stems from a gates-up-or-down inquiry—one either can or cannot access a computer system, and one either can or cannot access certain areas within the system.").

As to the cognizable "cost," the CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). The cost of investigation constituted a compensable "loss." *See Saunders Ventures, Inc. v. Salem*, 797 F. App'x 568, 572 (2d Cir. 2019).

The complaint alleges that "hundreds of man-hours (and tens of thousands of dollars in salaries and other costs) devoted by LaunchPass' employees" were lost when LaunchPass "detect[ed], investigate[d], and then respond[ed] to Whop's improper access." Doc. 72 at 38.

LaunchPass therefore plausibly alleges a CFAA claim.

**E.  Lanham Act Claim**

To state a false advertising claim under § 43(a) of the Lanham Act, a plaintiff must plausibly allege the falsity and materiality of the challenged statement. *Skillz Platform Inc. v. Papaya Gaming, Ltd.*, No. 24 Civ 1646 (DLC), 2024 WL 3526853, at *2 (S.D.N.Y. July 23, 2024) (quoting *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 56 (2d Cir. 2022)) (citation omitted). The plaintiff must also plausibly allege injury as a result of the defendants' false statements. *Id.*

A plaintiff can demonstrate falsity by showing that the challenged statements are either literally false or are likely to mislead and confuse consumers. *Perrin & Nissen Ltd. v. SAS Group Inc.*, No. 6 Civ. 13089 (MGC), 2009 WL 855693, at *9 (S.D.N.Y. Mar. 27, 2009) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir.2007)).

"A message can only be literally false if it is unambiguous." *Skillz Platform Inc.*, 2024 WL 3526853, at *2 (citation omitted). "[A]n impliedly false message leaves an impression on the listener or viewer that conflicts with reality." *Id.* (citation omitted).

"Impliedly false statements can be ambiguous, but their falsity is usually demonstrated through extrinsic evidence of consumer confusion or through evidence of the defendant's deliberate deception, which creates a rebuttable presumption of consumer confusion." *Id.* (citation omitted).

A plaintiff can plead materiality by demonstrating that the defendants' "false or misleading representation involved an inherent or material quality of the product." *Id.* (citation omitted). "In other words, the allegedly false statement must be likely to influence purchasing decisions." *Id.* (citation omitted).

The complaint alleges that:

(1) Whop's website stated that LaunchPass was charging ~2% more than Whop on each transaction;

(2) Whop's website stated that Whop charges "3% across the board" which "is lower than the 3.5% [creators] pay on LaunchPass—and that's not even considering the $29/month!";

(3) Whop made representations "directly to multiple LaunchPass customers that LaunchPass was now providing its services to other customers 'free of charge;'" and

(4) Whop published a blog post that stated that LaunchPass "has a reputation" for leaving "creators out in the cold when they need the support most," for failing "to meet creator expectations in customer support," for charging "higher fees that many are willing to stomach," and having "billing" issues.

Doc. 60 ¶¶ 71, 76–77, 79.

The first two statements are impliedly false. LaunchPass charged a 3.5% fee per transaction, along with a flat fee of $29 per month per community. Doc. 60 ¶ 72. Comparably, Whop charged a fee of 4.5% plus 40 cents or 3%, depending on the MoR. *Id.* ¶ 73. Therefore it cannot be the case that LaunchPass charged 2% more than Whop on each transaction, or that Whop charged 3% across the board. The Court has also discussed that Whop's services were likely not "free of charge" and why the third statement is also impliedly false. Regarding the fourth statement, "statements of opinion

are generally not the basis for Lanham Act liability." *See Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995).

The complaint also plausibly implies that Whop's representations regarding the comparatively lower fees charged by Whop are material as they would likely impact consumers' decisions. The complaint alleges injury in the form of the "loss of business opportunities, goodwill, reputation, profits and market share." *Id.* ¶ 219. The complaint alleges that LaunchPass lost more than 100,000 in monthly revenue and potential referrals due to Whop's conduct. *Id.* ¶ 90–91.

LaunchPass therefore sufficiently pled a Lanham Act claim.

### F. Disparagement Claim

A commercial disparagement claim arises when challenged representations "denigrat[e] the quality of the business' goods or services." *See Dentsply International Inc. v. Dental Brands for Less, LLC*, No. 15 Civ. 8775 (LGS), 2016 WL 6310777, at *6 (S.D.N.Y. Oct. 27, 2016) (quoting *Ruder & Finn Inc. v. Seaboard Surety Co.*, 422 N.E.2d 518, 522 (N.Y. 1981)). To state a commercial disparagement claim, a plaintiff must plausibly plead special damages "with sufficient particularity to identify actual losses." *See Zaret v. Bonsey*, No. 22 Civ. 7109 (AT), 2023 WL 6317956, at *3 (S.D.N.Y. Sept. 28, 2023), reconsideration denied, No. 22 Civ. 7109 (AT), 2023 WL 7627806 (S.D.N.Y. Nov. 14, 2023). Whether a plaintiff has suffered special damages "goes to the cause of an action itself and not merely to the recovery." *Id.* (quoting *Soter Technologies, LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 410 (S.D.N.Y. 2021)). The courts "strictly" apply the special damages requirement and "grant[ ] motions to dismiss for failure to allege special damages with the requisite specificity." *Id.* (citations omitted). To allege special damages, the plaintiff must "name the individuals who ceased to be customers and itemize the exact damages incurred," and may not merely "plead a round number untethered to" an actual lost sale. *Id.* (internal quotation marks and citation omitted).

The complaint identifies over a hundred customers that Whop diverted from LaunchPass by name.  Doc. 60 ¶¶ 90–91.  Defendants argue that the complaint does not specify whether LaunchPass lost those customers because of Whop's disparagement.  Doc. 66 at 40.  However, the causality is not required by law at this stage.  LaunchPass therefore sufficiently alleges a disparagement claim.

### G.  Commercial Defamation Claim

A commercial defamation claims arise when challenged representations "impugn the basic integrity or creditworthiness of a business."  *Dentsply International Inc.*, 2016 WL 6310777, at *6.

Whop published an advertisement on its blog that states:

> (1) Launchpass has a reputation for leaving creators out in the cold when they need the support most;
>
> (2) Launchpass fails to meet creator expectations in customer support. And they charge higher fees than many are willing to stomach; and
>
> (3) The last thing you want is for a member to have an issue with billing and have your delicate ecosystem start to crumble. But unfortunately, this is an experience Launchpass creators are all too familiar with.

*See* Doc. 60 ¶ 77.

Defendants contend that the statements at issue relate to the cost or quality of LaunchPass' services and does not impugn its basic integrity or creditworthiness.  Doc. 66 at 41–42.  However, the statements specifically reference on the "reputation" of LaunchPass.  The statements can reasonably be read to imply that LaunchPass provided unsatisfactory customer support.  *See Wexler v. Allegion (UK) Ltd.*, 2018 WL 1626346, at *10 (S.D.N.Y. Mar. 30, 2018) (finding the defendant's statement "could reasonably be read to suggest that [the plaintiff's] products . . . had quality issues and that [the defendant] acted improperly").  Even if customer support is not deemed to be a part of LaunchPass' product, because the statements "call[ed] into question LaunchPass' character," it plausibly alleges a defamation claim.  *Id.*

## H. Tortious Interference Claim

To state a tortious interference with prospective economic advantage claim, the plaintiff must plausibly allege that:  (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the plaintiff's relationship with the third party.  *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006).  The plaintiff is not required at the pleading stage "to identify with sufficient specificity the prospective contractual relationships in question . . . It would be unreasonable to require more specific pleadings prior to discovery."  *Leadsinger, Inc. v. Cole*, No. 05 CIV 5606 (HBP), 2006 WL 2320544, at *13 (S.D.N.Y. Aug. 10, 2006).

"In order to state a cause of action to recover for tortious interference with prospective economic advantage, the plaintiff must allege a specific business relationship with an identified third party with which the defendants interfered."  *See Influx Cap., LLC v. Pershin*, 186 A.D.3d 1622, 1624 (2020).  A tortious interference with prospective economic advantage claim is plausibly alleged if the complaint alleges the plaintiff's "existing business relationship" and that he "had and continue[d] to have reasonable expectation that these relationships w[ould be] ongoing."  *See Gym Door Repairs, Inc. v. Young Equipment Sales, Inc.*, 206 F. Supp. 3d 869, 912 (S.D.N.Y. 2016).  The complaint alleges that Whop diverted over one hundred customers with whom LaunchPass had long-term contractual relationships, and had every expectation that those relationships would continue and grow.  Doc. 60 ¶¶ 28, 90.  This is a sufficient allegation at this juncture.

## I. Unfair Competition Claim

To state a unfair competition claim based on a misappropriation theory, a plaintiff must allege "that the defendant:  (1) 'misappropriated the plaintiff[ ]'s labor[], skills,

expenditures, or good will'; and (2) 'displayed some element of bad faith in doing so.'" *See Sidney Frank Importing Co. v. Beam Inc.*, 998 F. Supp. 2d 193, 209 (S.D.N.Y. 2014).

The misuse of consumer lists may constitute unfair competition. *See*, e.g., *eCommission Solutions, LLC v. CTS Holdings Inc.*, 860 F. App'x 758, 760 (2d Cir. 2019); *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 447 (E.D.N.Y. 2011) ("[A] unfair competition . . . may be based on misappropriation of client lists, internal company documents, and business strategies 'if wrongful or fraudulent tactics [are] employed.'").

The complaint alleges that Defendants' employees signed up for LaunchPass' services under the pretense that they were regular customers and messaged LaunchPass' then customers to divert them to Whop. Doc. 60 ¶ 57. Whop's head of growth also submitted numerous inquiries to LaunchPass as a purported customer to inquire about LaunchPass' technological plans and capacities. *Id.* ¶ 64. The complaint also alleges that Whop poached Nguyen, LaunchPass' top customer service representative, who possessed knowledge of LaunchPass' "business strategy and largest customer identities, needs and preferences." *Id.* ¶¶ 64. The complaint thus plausibly displays bad faith of Defendants in misappropriating LaunchPass' client list and business strategies.

Defendants contend that the complaint fails to allege special damages. Doc. 66 at 44. There is no uniform practice in the Second Circuit as to whether an allegation of special damages is required for an unfair competition claim. The complaint alleges that "[a]fter Nguyen's departure [from LaunchPass], Whop interfered with and diverted" LaunchPass' largest and most critical accounts "in significant numbers and at a rapid pace." Doc. 60 ¶ 102. The alleged diversion of LaunchPass customers demonstrates special damages.

The complaint therefore plausibly alleges an unfair competition claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED in part and DENIED in part. Specifically, Defendants' motion is GRANTED as to the predatory

pricing and disparagement claims, and DENIED as to the attempted monopolization, CFAA, Lanham Act, commercial defamation, tortious interference, and unfair competition claims.  A status conference is scheduled for April 23, 2025, at 11:30 am.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 65.


It is SO ORDERED.


Dated: March 31, 2025
       New York, New York

_____
       EDGARDO RAMOS, U.S.D.J.